**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80992-CIV-CANNON/Reinhart**

**ROMSPEN INVESTMENT LP**,

Plaintiff,

v.

**STEPHEN J. DIBERT,**
**MFI-MIAMI HOLDINGS LLC,**
**MFI-MIAMI LLC,** and
**MFI-MIAMI NM LLC,**

Defendants.

________________________________/

**POST TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1]

**THIS CAUSE** comes before the Court following a one-day bench trial held on January 20, 2026 [ECF No. 389]. The bench trial concerned Plaintiff Romspen's Defamation and Defamation Per Se Claims against Stephen J. Dibert ("Dibert"), MFI-Miami Holdings LLC, MFI-Miami LLC, and MFI-Miami NM LLC (the "LLC Defendants") [ECF No. 396].[2] Upon full review of the operative Second Amended Complaint [ECF No. 60], the evidence and testimony presented over

[1] The Court is aware that Dibert, acting pro se, filed two Notices of Appeal in February 2026 (after trial but prior to entry of final judgment in this action) [ECF Nos. 402, 404]. In those notices, Plaintiff purports to appeal the Court's non-final rulings denying his meritless challenge to subject matter jurisdiction and his motion to recuse [ECF Nos. 385, 394]. Neither of those appeals divests this Court of jurisdiction to enter these Post-Trial Findings and Conclusions and the forthcoming Final Judgment. *See Steering Comm. v. Mead Corp. (In re Corrugated Container Antitrust Litig.)*, 614 F.2d 958, 960–62 (5th Cir. 1980) (explaining that the interlocutory denial of a motion to recuse the judge is not final or immediately appealable under the collateral order doctrine, as disqualification questions are fully reviewable on appeal from the final judgment); *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949); *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1355 (11th Cir. 2014).

[2] Romspen withdraws Count III of its Second Amended Complaint for civil conspiracy [ECF No. 400 p. 28 n.5]. That leaves Count I (Defamation) and Count II (Defamation Per Se) [ECF No. 60].

the course of the bench trial [ECF No. 396 (transcript); ECF No. 397 (admitted exhibits); ECF No. 401 (judicial notice order)], and the full record, the Court issues the following findings of fact and conclusions of law. Ultimately, the Court determines that Romspen has established by a preponderance of the evidence that Dibert, acting through the LLC Defendants, authored, published, and republished false and defamatory statements regarding Romspen on the publicly available websites contained in this Order. Accordingly, the Court finds that Romspen is entitled to a permanent injunction requiring Defendants to immediately remove from the identified websites, accounts, and URLs the specific Postings identified in this Order and enjoins Defendants from continuing to publish, repeat, or republish the specific Defamatory Per Se Statements and Defamatory Statements adjudicated in this Order. The Court also finds that Romspen is entitled to recover $500,000 in general damages, and $1,000,000 in punitive damages.

**BACKGROUND AND PROCEDURAL HISTORY**

This case arises out of an extensive online campaign orchestrated and conducted by Defendant Stephen J. Dibert, the author of the postings at issue and a self-proclaimed expert in mortgage fraud [*see generally* ECF No. 60]. Acting through a series of entities—MFI-Miami Holdings LLC, MFI-Miami LLC, and MFI-Miami NM LLC—Dibert published a plethora of online articles and blog posts accusing Romspen of fraudulent lending practices, predatory foreclosure tactics, and illegal conduct in its mortgage-lending business [ECF No. 60 ¶¶ 64–81]. Specifically, the online campaign—written and published by Dibert under various fictitious names to conceal his singular role—accused Romspen of fraud, Ponzi scheme conduct, money laundering, scamming elderly investors, and other misconduct across more than 175 publications on multiple interlinked websites and social media accounts [ECF No. 60]. The campaign continued despite

cease-and-desist letters, commencement of the present lawsuit, and rulings in other courts disproving key accusations.

Romspen filed this action on June 30, 2023, asserting claims for Defamation, Defamation Per Se and Civil Conspiracy [ECF No. 60]. The Clerk entered default against the LLC Defendants on March 27, 2025 [ECF No. 242]. Dibert has proceeded pro se since February of 2025 [ECF Nos. 197, 206] but failed to appear at the bench trial despite ample and proper notice [ECF No. 389; *see* ECF No. 354 (Order Specially Setting In-Person Bench Trial)].

During the bench trial [ECF No. 396 (transcript)], Romspen called two witnesses: Wesley Roitman, Romspen's Managing Partner; and Jaclyn Shaw, a Member of Romspen's Investor Relations Team.[3] Romspen presented approximately seventy exhibits [ECF Nos. 397-1 through 397-69] and presented opening and closing arguments [ECF No. 389]. As detailed in a lengthy order entered prior to trial, the Court previously barred Dibert from introducing any testimonial or documentary evidence at the bench trial due to repeated violations of Court orders, the Federal Rules of Civil Procedure, and basic standards of professional conduct [ECF No. 387 (referencing *e.g.*, ECF Nos. 133, 144, 156 p. 37, 219 pp. 3–8, 339)].

After weighing the factual record in its entirety and making appropriate credibility findings, the Court issues the following findings of fact. The Court limits its findings to the trial record and expresses no opinion on any subsequent facts or conduct outside the evidentiary record.

---

[3] Both sides waived the jury trial demands in the Complaint and Answer [ECF No. 303 (noting that parties have waived jury trial)].

## I. FINDINGS OF FACT

### A. *Plaintiff*

1. The Romspen corporate group is a private, non-bank financial firm that specializes in commercial and industrial real estate lending across North America. Its real estate-backed investment funds have approximately $3 billion (Canadian dollars) in aggregate assets under management on behalf of its investors, including individuals, family offices, foundations, endowments, and pension plans serving retirees [ECF No. 396 p. 22].

2. Romspen Investment LP (hereinafter, "Romspen") is part of the Romspen corporate group and performs mortgage management services for various mortgages in the broader Romspen portfolio [ECF No. 396 p. 35].

3. Romspen is a citizen of Canada [ECF No. 60 (noting that Romspen is incorporated and has its principal place of business in Ontario, Canada, and that Romspen Investment LP has one general partner and one limited partner, both of which are Ontario, Canada corporations with principal places of business in Ontario)].

4. Romspen earns revenues in the form of loan servicing fees, origination fees, renewal fees, and a percentage management fee based on the size of the fund and capital received from investors [ECF No. 396 p. 31]. Romspen's revenues are impacted by the level of capital raised from investors and the level of borrowing by borrowers [ECF No. 396 p. 31].

5. Romspen belongs to a competitive industry with only a finite investor base [ECF No. 396 p. 182]. Accordingly, Romspen must instill investor confidence in its ability to manage its commercial mortgage investment portfolio [ECF No. 396 p. 188].

6. Over the past several decades, Romspen's business model has achieved the goal of instilling investor confidence by maintaining a reputation of reliability, transparency, competence,

and diligence in dealing with its various stakeholders, which include investors, borrowers, and financial institutions [ECF No. 396 pp. 27, 120–121, 188]. This reputation is crucial for Romspen's success (including its ability to raise investor funds or receive fees on borrower loans) [ECF No. 396 pp. 29, 163, 173, 188–189, 192].

7. As a result of its track record, Romspen is thought of as a reliable market participant in its industry and as a reliable and consistently high-achieving mortgage investment fund [ECF No. 396 pp. 27, 186–187].

8. Romspen recognizes that investors depend on it for capital preservation and performance on long-term investments [ECF No. 396 pp. 27, 181].

9. Romspen pays its investors monthly returns and has done so previously even if redemptions (returning original capital) have been frozen or "gated" [ECF No. 396 pp. 100–101].[4]

10. No court or regulator has ever found Romspen civilly liable for fraudulent conduct [ECF No. 396 p. 49].

11. One loan which Romspen made related to property near the Miami International Airport, referred to as "Blue Lagoon," became a subject of litigation involving an individual named Caroline Weiss and her daughter Adeena Weiss-Ortiz [ECF No. 396 pp. 44–45, 48–50, 55].

12. Prior to making the Blue Lagoon loan, Romspen conducted due diligence and went through an underwriting process [ECF No. 396 pp. 53, 67–68].

---

[4] "A gate provision lets hedge funds limit or temporarily restrict investor withdrawals when markets are stressed or during low liquidity. These provisions help prevent a run on the fund by slowing large outflows and giving managers time to sell assets, especially during economic uncertainty." James Chen, *How Gate Provisions Work: A Guide for Hedge Fund Investors*, INVESTOPEDIA (June 17, 2026), https://www.investopedia.com/terms/g/gateprovision.asp.

13. Title insurance covered Romspen's mortgage on the Blue Lagoon property and would have given Romspen full recourse if a court had found the mortgage invalid, void, or voidable [ECF No. 396 pp. 47, 164].

14. On August 10, 2024, the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, entered its Final Judgment of Foreclosure (In Rem Relief Only) in the action *TIG Romspen US Master Mortgage LP v. 7 at Blue Lagoon (1), LLC et al.*, Case No. 2023-017596-CA-01, which held TIG Romspen US Master Mortgage LP's mortgage over the Blue Lagoon property is valid and enforceable, and awarded more than $17,924,273.90 to TIG Romspen US Master Mortgage LP [ECF No. 399 (Romspen requesting Court to take Judicial Notice); ECF No. 399-1 pp. 5–17 (Final Judgment in case mentioned above); ECF No. 401 (Court granting Romspen's request and taking notice of above mentioned decision)].

15. On August 12, 2025, the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, entered its Supplemental Final Judgment Awarding Romspen's Attorneys' Fees and Interest and Setting Foreclosure Sale in the action *TIG Romspen US Master Mortgage LP v. 7 at Blue Lagoon (1), LLC et al.*, which awarded TIG Romspen US Master Mortgage LP a total of $20,978,128.54 plus post-judgment interest [ECF No. 399 (Romspen requesting Court to take Judicial Notice); ECF No. 399-1 pp. 1–2 (Supplemental Final Judgment in case mentioned above); ECF No. 401 (Court granting Romspen's request and taking notice of above mentioned decision)].

16. On January 22, 2026, the United States Bankruptcy Court for the Southern District of Florida entered its Unopposed Order Continuing Hearings, Requiring Compliance with Procedures for Marketing and Sale of Debtors' Real Property and Granting Other Relief in the action *In re: 7 At Blue Lagoon (1), LLC and 7 at Blue Lagoon (2), LLC*, Case Nos. 25-21286-

RAM & 25-21287, in which the Court acknowledged and memorialized the debtors' stipulation, and in which the Court determined that the amount owed to Romspen was the foreclosure judgment amount of $20,978,128.54 plus post-judgment interest and fees, and that Romspen's "Secured Claim [was] fully secured" [ECF Nos. 399 (Romspen requesting Court to take Judicial Notice), 399-2 (Unopposed Order Continuing Hearings, Requiring Compliance with Procedures for Marketing and Sale of Debtors' Real Property and Granting Other Relief mentioned above); 401 (Court granting Romspen's request and taking notice of above mentioned decision)].

**B. *Defendants***

17. Dibert is an individual who was domiciled in Florida at the time this lawsuit was filed [ECF No. 74-8 ¶¶ 11, 14 (Defendant Dibert's affidavit stating he resided in Florida until January 2023 but then left with no intention of returning and that he "travels the world"); ECF No. 74 p. 18 (Defendant Dibert stating that he "is currently traveling, and his future domicile is yet to be determined"); ECF No. 96 p. 4 (finding that Dibert continued to be domiciled in Florida at the time this action was commenced)[5]; ECF No. 96 p. 4 (denying Defendants' motion to dismiss based on lack of personal jurisdiction)].

18. Dibert is the sole member and 100% owner of Defendant MFI-Miami, LLC. Dibert was the sole person associated with the LLC [ECF No. 397-60 ¶ 3; ECF No. 397-53 p. 8 (MFI-Miami, LLC Operating Agreement); ECF No. 397-52 p. 6 (Dibert July 2022 Deposition Transcript, pp. 18:20–19:4 stating that MFI-Miami has never had any employees besides Dibert)].

[5] Dibert's assertions that he left Florida with no intent to return (made in connection with a prior motion to dismiss for lack of personal jurisdiction [ECF No. 87 p. 18]) are immaterial because the record does not establish that he resided somewhere outside of Florida with the intent to remain. *See Scoggins v. Pollock*, 727 F.2d 1025, 1028 (11th Cir. 1984) (noting that when a party has not established a new domicile, his former domicile remains controlling). Plus, Dibert was domiciled in Florida when this suit commenced, and the Court need not continually reexamine personal jurisdiction once established and litigated [ECF No. 96].

19. Dibert was the sole member and 100% owner of Defendant MFI-Miami NM, LLC. Dibert was the sole person associated with the LLC during its existence [ECF No. 397-60 ¶ 3; ECF No. 397-53 p. 3 (MFI-Miami, NM, LLC Operating Agreement)].

20. Dibert was the sole member and 100% owner of Defendant MFI-Miami Holdings, LLC. Dibert was the sole person associated with the LLC during its existence [ECF No. 397-60 ¶ 3; ECF No. 397-53 p. 13 (MFI-Miami Holdings, LLC Operating Agreement); ECF No. 397-52 p. 6 (Dibert July 2022 Deposition Transcript, p. 44:2-11 stating he was the sole member and 100% owner of MFI-Miami Holdings, LLC during its existence)].

21. The LLC Defendants conducted business in Florida and there was a general course of business activity by the LLC Defendants in Florida [ECF No. 96 pp. 5–6 (Court Order finding that the LLC Defendants conduct business in Florida given that they have "an office in Florida and their sole employee has been domiciled in Florida at all relevant times")].

22. Romspen has never had any business, lender, investor, or other relationship or engagement with Defendants [ECF No. 396 p. 48].

23. Defendants falsely denied Dibert's involvement with the LLC Defendants in discovery [ECF No. 397-50 pp. 3–4, 14 (Defendant Dibert answering "none" in response to interrogatory stating "identify every legal entity in which Defendant Dibert is presently involved or has had any involvement since January 1, 2010"); ECF No. 397-50 p. 14 (LLC Defendants answering "none" in response to the same interrogatory)].

24. Defendants failed to comply with corporate formalities for the LLC Defendants, including maintaining corporate documents and financial statements, filing tax returns, and maintaining separate bank accounts [ECF No. 397-51 pp. 7 (responding "none" to request for "[a]ll [d]ocuments reflecting of [y]our past, present, or projected financial condition, including but not

limited to, any income statements, balance sheets, revenue statements, profit statements, expense statements, expense reports, statements of assets, or statements of liabilities"), 7–8 (responding "none" to Request for "[a]ll financial statements for any financial accounts, bank account, credit card account, debit card account, or line of credit that Defendant Dibert or any MFI Entity had any interest in or access to" from January 1, 2022 to the present), 8 (responding "none" to request for "the contents of any money management software program, application of website" relevant to the "finances of Defendant Dibert or any MFI Entity" from January 1, 2022 to the present and responding "none" to request for "[a]ll tax returns filed by [y]ou, or that are in the process of being prepared for filings by [y]ou"), 12 (responding "none" to request for "[a]ll articles of incorporation, LLC Agreements, bylaws, or other formational documents for each of the MFI Entities, and all subsequent amendments to such documents"), 14 (responding "none" to request for "[a]ll [d]ocuments relating to [y]our compliance with the legal requirements necessary to maintain the proper limited-liability status for any entity" in which you have any "ownership interest," "managerial authority," or "exercise or have exercised any control"); ECF No. 397-50 pp. 11, 17–18 (answering "none" in response to interrogatory stating "[f]or every financial institution, financial account, debit card, credit card, and charge card, and money transfer service (e.g., Venmo, Zelle, PayPal) at which Dibert or any MFI Entity has had any ownership interest in or signatory authority on an account, or with which Dibert or any MFI Entity has had any financial relationship, since January 1, 2022, Identify the business entity, state the account number(s) related to the relationship, state the date range the financial relationship existed, state the purpose of the financial relationship, state the highest money balance of such account or card and the date thereof, and the reason such relationship was terminated.")].

25. Dibert used each LLC Defendant to make a one-person operation appear to consist of separate actors. FF ¶¶ 18–20, 31.

26. Defendants have claimed to have no assets and Dibert has further claimed he is "judgment proof" [*see* ECF No. 397-66 (Defendant Dibert stating "even in the off chance you get a judgment against me, you will never collect it"); ECF No. 397-50 (Dibert's Responses to Interrogatories Nos. 9, 15 & LLC Defendants' Responses to Interrogatories Nos. 9, 14 identifying no assets)].

27. The Clerk entered default against the LLC Defendants on March 27, 2025 [ECF Nos. 241, 242].

**C. *Defendants' Campaign Against Romspen: Websites, Postings, and Content***

28. Defendants operated (and operate) and controlled (and control), and Dibert wrote the content for (and continues to write the content for) the publicly accessible websites https://mfi-miami.com ("MFI-Miami.com" or "MFI-Miami Website"), https://RomspenRipoff.com ("RomspenRipoff.com" or "RomspenRipoff Website"), https://RomspenReport.com ("RomspenReport.com" or "RomspenReport Website"), and the "mfimiami1" and "Romspen Complaints" accounts on Medium.com, https://medium.com/@mfimiami1 and https://romspen-complaints-blog.medium.com ("Medium Accounts")[6] [*See, e.g.*, ECF No. 397-52 p. 12 (Dibert July 2022 Deposition, pp. 42:4-43:5 (admitting to control over MFI-Miami.com); ECF No. 397-3 p. 8 (showing Dibert's contact information for MFI-Miami.com); ECF No. 397-24 p. 3 (providing Dibert's contact information for MFI-Miami, LLC and MFI-Miami.com); ECF No. 397-69 p. 60 (Dibert testimony admitting to control over "mfimiami1" account on Medium.com); ECF No. 397-

[6] MFI-Miami.com, RomspenRipoff.com, RomspenReport.com, and the Medium Accounts are collectively referred to herein as the "Websites."

25 p. 3 (RomspenRipoff.com article by "Dennis Romspun" referring to Dibert in first person); ECF No. 397-32 p. 3 (same); ECF No. 397-36 p. 10 (MFI-Miami.com article referring to RomspenRipoff.com as "us"); ECF No. 397-66 p. 2 (Dibert stating that if Romspen pays him $450,000 he will "[r]emove all Romspen articles from the websites I control"); ECF No. 396 pp. 209–12 (noting the similarity of language, style, and imagery used in all Postings (defined below) across all Websites and "Dennis Romspun" byline on RomspenRipoff.com and RomspenReport.com); ECF No. 87 p. 24 (noting that "[t]he author of the postings, Dibert, is a 'blogger'"); ECF No. 343 p. 5 (Dibert's Motion for Summary Judgment referring to the postings at issue as "Dibert's articles" and "Dibert's content")].

29. Dibert's conduct in authoring, publishing, or re-publishing the Postings was motivated, in part, by personal financial gain [*See, e.g.*, ECF No. 397-52 pp. 12, 14 (Dibert July 2022 Deposition 42:4–43:5, 51:6–15 testifying that Dibert's sole means of supporting himself is by acting as a mortgage expert and that Dibert obtains clients for those services by writing articles and blogs); ECF No. 396 p. 173 (discussing Dibert serving as testifying witness after Postings)]. *See also* https://mfi-miami.com/introduction-to-mfi-miami/ ("We offer a host of investigative services and litigation support to attorneys.").

30. At times, the Websites have cross-referenced and promoted each other. [*See, e.g.*, ECF No. 397-2 p. 13 (mfimiami1 Medium Account linking to MFI-Miami.com); ECF No. 397-3 p. 14 (same); ECF No. 397-6 p. 8 (same); ECF No. 397-27 p. 16 (mfimiami1 Medium Account linking to RomspenRipoff.com); ECF No. 397-31 pp. 11–12 (MFI-Miami.com linking to RomspenRipoff.com), 24 (mfimiami1 Medium Account linking to RomspenRipoff.com); ECF No. 397-32 p. 9 (MFI-Miami.com linking to RomspenRipoff.com); ECF No. 397-34 p. 12 (same); ECF No. 397-36 p. 10 (MFI-Miami.com article writing, "[s]everal senior citizen investors who

were at the 2024 meeting contacted RomspenRipoff.com. They informed us . . .” and including hyperlink to RomspenRipoff.com) (emphasis added); ECF No. 397-41 p. 4 (MFI-Miami.com linking to RomspenRipoff.com); ECF No. 397-42 pp. 4 (RomspenRipoff.com linking to RomspenReport.com), 9 (MFI-Miami.com linking to RomspenReport.com); ECF No. 397-43 p. 4 (RomspenRipoff.com linking to RomspenReport.com); ECF No. 397-44 p. 11 (same); ECF No. 397-64 pp. 2 (RomspenReport.com linking to MFI-Miami.com), 11 (RomspenRipoff.com linking to MFI-Miami.com), 13 (same); ECF No. 397-67 p. 3 (RomspenReport.com linking to RomspenRipoff.com)].

31. Defendants fabricated that there were more individuals than Dibert behind the Websites and Dibert wrote under fictitious author names in an attempt to add credibility to the defamatory statements therein [*Compare*, *e.g.*, ECF No. 397-3 pp. 2, 10; ECF No. 397-12 pp. 3–4, 14, 23–24; ECF No. 397-13 pp. 3, 13, 23; ECF No. 397-14 pp. 2, 5, 15, 25, 27; ECF No. 397-17 pp. 3, 15; ECF No. 397-19 pp. 2, 11; ECF No. 397-23 pp. 10, 19, 29; ECF No. 397-35 p. 2; ECF No. 397-36 pp. 3, 10; ECF No. 397-39 p. 2; ECF No. 397-40 p. 2; ECF No. 397-44 pp. 2, 9; ECF No. 397-45 p. 3; ECF No. 397-46 p. 2; ECF No. 397-61 pp. 3, 7, ECF No. 397-65 pp. 3, 12–13; ECF No. 397-67 p. 3; ECF No. 397-68 p. 5 (all with references to “we” or “associates” or “our” or “us” or “editors”), *with* FF ¶¶ 18–20 & ECF No. 397-50 (Dibert and LLC Defendants’ Responses to Interrogatories Nos. 2, 3, 5, 6: identifying no communications with MFI personnel relating to Postings); ECF No. 397-51 (Dibert and LLC Defendants’ Responses to Request for Production No. 33 (same)].

32. Defendants have published numerous articles, postings, or statements regarding Romspen on the Websites, including the following:

1. https://mfi-miami.com/2022/05/miami-developer-caroline-weiss

2. https://mfi-miami.com/2022/06/romspen-sued/
3. https://mfi-miami.com/2023/08/romspen-investment-corp/
4. https://mfi-miami.com/2023/09/romspen-investor-warning/
5. https://mfi-miami.com/2023/09/romspen-is-withholding-partial-redemption/
6. https://mfi-miami.com/2023/09/romspen-investors-are-mad-as-hell/
7. https://mfi-miami.com/2023/09/romspen-threw-in-the-towel-on-uphill-foreclosure-fight/
8. https://mfi-miami.com/2023/09/romspen-gave-3-stoners/
9. https://mfi-miami.com/2023/09/romspen-super-lawyer/
10. https://mfi-miami.com/tag/romspen/
11. https://mfi-miami.com/2023/10/the-deceptive-romspen-loan-to-own/
12. https://mfi-miami.com/2023/11/romspen-is-scamming-grandma
13. https://mfi-miami.com/2023/11/miami-fraudster-caroline-weiss/
14. https://mfi-miami.com/2023/12/another-justin-trudeau-scandal/
15. https://mfi-miami.com/2024/05/romspen-financial-colonoscopy-is-it-really-going-to-happen/
16. https://mfi-miami.com/2024/05/romspen-lawyers/
17. https://mfi-miami.com/2024/07/fake-real-estate-tycoon/
18. https://mfi-miami.com/2024/10/revenu-quebec-raided-romspen-headquarters/
19. https://mfi-miami.com/2024/12/romspen-attorney-christian-poland/
20. https://mfi-miami.com/2025/01/romspen-lending-practices/
21. https://mfi-miami.com/2025/01/elderly-romspen-investors/
22. https://mfi-miami.com/2025/01/romspen-investor-fraud-victims/

23. https://mfi-miami.com/2025/01/illinois-attorney-christian-poland/
24. https://mfi-miami.com/2025/01/21-3-million-romspen-loan-spurs-complaint-to-florida-ofr/
25. https://mfi-miami.com/2025/02/romspen-lawyer-christian-poland/
26. https://mfi-miami.com/2025/02/wesley-roitman-admits-romspen-future-is-uncertain/
27. https://mfi-miami.com/2025/02/buffoon-lawyer-christian-poland/
28. https://mfi-miami.com/2025/03/judge-reverses-romspen-foreclosure-case-goes-to-mediation/
29. https://mfi-miami.com/2025/03/wesley-roitman-looks-worried/
30. https://mfi-miami.com/2025/04/is-miami-attorney-ezequiel-romero-a-fat-patsy/
31. https://mfi-miami.com/2025/04/romspen-will-stiff-their-lawyers-at-bryan-cave-leighton-paisner/
32. https://mfi-miami.com/2025/06/is-romspen-executive-wesley-roitman-a-drug-addict/
33. https://mfi-miami.com/2025/06/romspen-executives-frequently-engage-in-illicit-drug-use/
34. https://mfi-miami.com/2025/06/peter-oelbaum-is-the-coked-out-executive-also-a-sicko-pervert/
35. https://mfi-miami.com/2025/06/rcmp-is-investigating-romspen-executives-over-fraud-claims/
36. https://mfi-miami.com/2025/06/romspen-versus-mfi-miami-others-said-the-same-thing-we-did/

37. https://mfi-miami.com/2025/06/romspen-annual-meeting/
38. https://mfi-miami.com/2025/07/is-cibc-planning-to-sue-romspen-for-fraud/
39. https://mfi-miami.com/2025/07/is-bclp-attorney-christian-polands-job-on-the-chopping-block/
40. https://mfi-miami.com/2025/08/attorney-kyle-hirsch-busted/
41. https://mfi-miami.com/2025/08/the-weiss-family-feud-is-over/
42. https://mfi-miami.com/2025/09/romspen-executives-secret-plan-to-liquidate-loans-for-pennies/
43. https://mfi-miami.com/2025/10/romspen-flushing-3-million-down-the-toilet/
44. https://mfi-miami.com/2025/12/inept-romspen-management-costs-romspen-130-million/
45. https://medium.com/@mfimiami1/miami-developer-caroline-weiss-accused-of-multiple-counts-of-fraud-656021b7b4
46. https://medium.com/@mfimiami1/romspen-sued-for-21m-in-miami-real-estate-fraud-case-7f2b13b6a83d
47. https://medium.com/@mfimiami1/romspen-investment-corp-sues-fake-real-estate-tycoon-c49b4adc8b88
48. https://romspen-complaints-blog.medium.com/romspen-did-you-event-check-these-people-out-before-you-gave-them-money-a615c5912579
49. https://romspen-complaints-blog.medium.com/romspen-investment-corporation-complaints-from-people-who-have-dealt-with-them-93fdb2648787
50. https://medium.com/@mfimiami1/romspen-investor-warning-998368ca1eb3

51. https://medium.com/@mfimiami1/romspen-is-withholding-partial-redemption-payments-fdc1671af475
52. https://medium.com/@mfimiami1/romspen-investors-are-mad-as-hell-and-want-their-money-743442b9550f
53. https://medium.com/@mfimiami1/romspen-threw-in-the-towel-on-uphill-foreclosure-fight-3c9b2cae4909
54. https://medium.com/@mfimiami1/romspen-gave-3-stoners-54-million-466ecb7103c0
55. https://medium.com/@mfimiami1/will-a-romspen-super-lawyer-cost-romspen-21-million-17e239826520
56. https://medium.com/@mfimiami1/romspen-just-got-spanked-by-the-florida-3rd-dca-a673cabfb08d
57. https://medium.com/@mfimiami1/the-deceptive-romspen-loan-to-own-toxic-financing-scam-2909e0828c57
58. https://medium.com/@mfimiami1/romspen-is-scamming-grandma-and-grandpa-dd1e7ee58a3b
59. https://medium.com/@mfimiami1/another-justin-trudeau-scandal-on-the-horizon-is-pm-too-cozy-with-romspen-3709a5f9e648
60. https://medium.com/@mfimiami1/romspen-financial-colonoscopy-is-it-really-going-to-happen-0ea96916bd47
61. https://medium.com/@mfimiami1/romspen-lawyers-stuck-in-the-mud-in-multiple-lawsuits-c10ed598963c

62. https://medium.com/@mfimiami1/romspen-attorney-christian-poland-under-investigation-for-upl-5fb594bf11ed
63. https://medium.com/@mfimiami1/will-romspen-lending-practices-be-investigated-by-florida-ofr-4a738f26c903
64. https://romspenripoff.com/miami-developer-caroline-weiss/
65. https://romspenripoff.com/romspen-sued/
66. https://romspenripoff.com/romspen-investment-corp-sues-fake-real-estate-tycoon/
67. https://romspenripoff.com/romspen-investor-warning/
68. https://romspenripoff.com/romspen-withholds-partial-redemption/
69. https://romspenripoff.com/romspen-investors-are-mad/
70. https://romspenripoff.com/romspen-threw-in-the-towel/
71. https://romspenripoff.com/romspen-gave-3-stoners/
72. https://romspenripoff.com/will-a-romspen-super-lawyer-cost-romspen-21-million/
73. https://romspenripoff.com/romspen-just-got-spanked/
74. https://romspenripoff.com/deceptive-romspen-loan-to-own/
75. https://romspenripoff.com/romspen-is-scamming/
76. https://romspenripoff.com/miami-fraudster-caroline-weiss/
77. https://romspenripoff.com/another-justin-trudeau-scandal/
78. https://romspenripoff.com/romspen-financial-colonoscopy/
79. https://romspenripoff.com/romspen-lawyers-1/
80. https://romspenripoff.com/fake-real-estate-tycoon-caroline-weiss/
81. https://romspenripoff.com/romspen-headquarters-raided-by-revenu-quebec/
82. https://romspenripoff.com/romspen-attorney-christian-poland/

83. https://romspenripoff.com/romspen-is-in-trouble-financially/
84. https://romspenripoff.com/will-romspen-be-investigated/
85. https://romspenripoff.com/is-attorney-christian-poland-fighting-substance-abuse-demons/
86. https://romspenripoff.com/elderly-romspen-investors/
87. https://romspenripoff.com/romspen-investment-corporation-reviews/
88. https://romspenripoff.com/romspen-fraud-victims/
89. https://romspenripoff.com/romspen-fixer-christian-poland/
90. https://romspenripoff.com/romspen-complaints/
91. https://romspenripoff.com/romspen-lawsuits/
92. https://romspenripoff.com/romspen-busted-conspiring/
93. https://romspenripoff.com/is-lawyer-christian-poland-defrauding/
94. https://romspenripoff.com/romspen-lawyer-christian-poland/
95. https://romspenripoff.com/wesley-roitman-admits/
96. https://romspenripoff.com/masochist-lawyer-christian-poland/
97. https://romspenripoff.com/wesley-roitman-looks-worried/
98. https://romspenripoff.com/romspen-foreclosure/
99. https://romspenripoff.com/romspen-victims/
100. https://romspenripoff.com/will-romspen-file-bankruptcy-in-2025/
101. https://romspenripoff.com/inept-attorney-christian-poland/
102. https://romspenripoff.com/is-romspen-executive-wesley-roitman-a-drug-addict/
103. https://romspenripoff.com/romspen-executives-frequently-engage-in-illicit-drug-use/

104. https://romspenripoff.com/coked-out-peter-oelbaum/

105. https://romspenripoff.com/rcmp-is-investigating-romspen-executives-over-fraud-claims/

106. https://romspenripoff.com/annual-romspen-investors-meeting-was-an-absolute-crazy-train/

107. https://romspenripoff.com/cibc-is-allegedly-planning-to-sue-romspen-for-fraud/

108. https://romspenripoff.com/bclp-attorney-christian-poland/

109. https://romspenripoff.com/romspen-attorney-kyle-hirsch-busted-in-phony-credit-bid-scheme/

110. https://romspenripoff.com/romspen-executives-are-having-a-meltdown/

111. https://romspenripoff.com/is-holland-bloorview-taking-dirty-money-from-wesley-roitman/

112. https://romspenripoff.com/romspen-flushing-3-million-down-the-toilet/

113. https://romspenripoff.com/irate-romspen-investors/

114. https://romspenripoff.com/incompetent-romspen-executives-cost-romspen-130-million/

115. https://romspenripoff.com/la-kosher-nostra-romspen-sees-another-scheme-blow-up-in-their-face/

116. https://romspenripoff.com/romspen-is-patient-zero-in-the-financial-crisis-gripping-canada/

117. https://romspenreport.com/miami-developer-caroline-weiss/

118. https://romspenreport.com/romspen-sued/

119. https://romspenreport.com/romspen-investment-corp-sues-fake-real-estate-tycoon/
120. https://romspenreport.com/romspen-withholds-partial-redemption/
121. https://romspenreport.com/romspen-investors-are-mad/
122. https://romspenreport.com/romspen-threw-in-the-towel/
123. https://romspenreport.com/romspen-gave-3-stoners/
124. https://romspenreport.com/will-a-romspen-super-lawyer-cost-romspen-21-million/
125. https://romspenreport.com/romspen-just-got-spanked/
126. https://romspenreport.com/deceptive-romspen-loan-to-own/
127. https://romspenreport.com/romspen-is-scamming/
128. https://romspenreport.com/miami-fraudster-caroline-weiss/
129. https://romspenreport.com/another-justin-trudeau-scandal/
130. https://romspenreport.com/romspen-financial-colonoscopy/
131. https://romspenreport.com/romspen-lawyers-1/
132. https://romspenreport.com/fake-real-estate-tycoon-caroline-weiss/
133. https://romspenreport.com/romspen-headquarters-raided-by-revenu-quebec/
134. https://romspenreport.com/romspen-attorney-christian-poland/
135. https://romspenreport.com/romspen-is-in-trouble-financially/
136. https://romspenreport.com/will-romspen-be-investigated/
137. https://romspenreport.com/is-attorney-christian-poland-fighting-substance-abuse-demons/
138. https://romspenreport.com/elderly-romspen-investors/

139. https://romspenreport.com/romspen-investment-corporation-reviews/

140. https://romspenreport.com/romspen-fraud-victims/

141. https://romspenreport.com/romspen-fixer-christian-poland/

142. https://romspenreport.com/no-fraud-in-romspen-mortgage-investment-fund/

143. https://romspenreport.com/romspen-complaints/

144. https://romspenreport.com/romspen-lawsuits/

145. https://romspenreport.com/romspen-investment-corporation/

146. https://romspenreport.com/romspen-busted-conspiring/

147. https://romspenreport.com/is-lawyer-christian-poland-defrauding/

148. https://romspenreport.com/wesley-roitman-admits/

149. https://romspenreport.com/buffoon-lawyer-christian-poland/

150. https://romspenreport.com/masochist-lawyer-christian-poland/

151. https://romspenreport.com/wesley-roitman-looks-worried/

152. https://romspenreport.com/romspen-foreclosure/

153. https://romspenreport.com/romspen-victims/

154. https://romspenreport.com/will-romspen-file-bankruptcy-in-2025/

155. https://romspenreport.com/miami-attorney-ezequiel-romero/

156. https://romspenreport.com/deadbeat-romspen-will-stiff-their-lawyers/

157. https://romspenreport.com/inept-attorney-christian-poland/

158. https://romspenreport.com/is-romspen-executive-wesley-roitman/

159. https://romspenreport.com/romspen-executives-frequently-engage-in-illicit-drug-use/

160. https://romspenreport.com/2025-romspen-mortgage-investment-fund/

161. https://romspenreport.com/peter-oelbaum/

162. https://romspenreport.com/romspen-victims-planning-protest-at-annual-investor-meeting/

163. https://romspenreport.com/rcmp-is-investigating-romspen/

164. https://romspenreport.com/annual-romspen-investors-meeting/

165. https://romspenreport.com/cibc-preparing-to-sue-romspen/

166. https://romspenreport.com/is-bclp-attorney-christian-polands-job-on-the-chopping-block/

167. https://romspenreport.com/romspen-attorney-kyle-hirsch-busted-in-phony-credit-bid-scheme/

168. https://romspenreport.com/romspen-executives-are-having-a-meltdown/

169. https://romspenreport.com/romspen-executives-secret-plan-to-liquidate-loans-for-pennies/

170. https://romspenreport.com/holland-bloorview/

171. https://romspenreport.com/romspen-flushing-3-million/

172. https://romspenreport.com/irate-romspen-investors/

173. https://romspenreport.com/romspen-faces-130-million-hit/

174. https://romspenreport.com/another-romspen-scheme-blows-up/

175. https://romspenreport.com/romspen-is-patient-zero/.[7]

33. Defendants published the Postings on or about the dates listed in the Postings. The publications that post-date the Second Amended Complaint ("SAC") consist of: (a) postings that

[7] These articles and the "press releases" referenced in FF ¶ 34 below are collectively referred to herein as the "Postings."

are re-publications of all or part of the publications referred to in the SAC to new internet locations; (b) postings that contain defamatory content that is the same as or similar to that encompassed by the SAC; and (c) postings that contain additional content related to Romspen that is relevant to various issues in this lawsuit, including Romspen's requests for injunctive relief and punitive damages, and with respect to Defendants' state of mind, continuation of wrongful conduct, wrongful intent, reckless disregard for the truth or falsity of the statements made, and lack of remorse. *See* FF ¶ 32.

34. Defendants also published some content through an automated press release service called "24-7 PressRelease," including at the following URLs: (a) https://www.24-7pressrelease.com/press-release/517232/illinois-attorney-christian-poland-under-ethics-investigation-in-florida?swe=Romspen; (b) https://www.24-7pressrelease.com/press-release/519153/elderly-romspen-investment-corporation-investors-who-suspect-they-may-be-victims-of-investor-fraud-may-be-entitled-to-compensation; (c) https://www.24-7pressrelease.com/press-release/519164/213-million-romspen-loan-spurs-complaint-to-the-florida-office-of-financial-regulation; and (d) https://www.24-7pressrelease.com/press-release/519196/chicago-attorney-christian-poland-faces-another-bar-complaint.

**CATEGORY ONE STATEMENTS**

35. The Postings contain the following false statements that accuse Romspen of criminal conduct or conduct incompatible with the proper exercise of its business (the "**Category One Statements**"), each cited herein with corresponding citations from the trial record:

**a) Referring to Romspen's business and business model as a "Ponzi scheme."**

[ECF No. 397-13 pp. 2–3, 7 (mfimiami1 Medium Account), 13, 15 (MFI-Miami.com), 22 (RomspenRipoff.com); ECF No. 397-14 p. 2, 4–5 (MFI-Miami.com), 15–16 (MFI-Miami.com),

25–27 (RomspenRipoff.com); ECF No. 397-15 pp. 4 (mfimiami1 Medium Account), 15–16 (MFI-Miami.com), 25 (RomspenRipoff.com); ECF No. 397-21 pp. 13, 21 (mfimiami1 Medium Account), 26 (RomspenRipoff.com); ECF No. 397-22 p. 3 (RomspenRipoff.com), ECF No. 397-23 p. 10 (MFI-Miami.com); ECF No. 397-27 pp. 2 (RomspenRipoff.com), 11 (mfimiami1 Medium Account); ECF No. 397-28 p. 2 (RomspenRipoff.com); ECF No. 397-29 p. 2 (RomspenRipoff.com); ECF No. 397-33 pp. 1–2 (RomspenRipoff.com); ECF No. 397-41 pp. 1–2 (MFI-Miami.com); ECF No. 397-63 p. 5 (MFI-Miami.com); ECF No. 397-67 p. 3 (RomspenReport.com)]. This is false [ECF No. 396 p. 78 (stating that Romspen's operations and business model are not a Ponzi scheme)].

**b) Referring to Romspen as engaged in a "deceptive," "highly deceptive," "shady," and/or "sinister" "loan-to-own toxic financing scam" or "lending scam" or "scheme"**

[ECF No. 397-12 pp. 1, 3–4, 6 (mfimiami1 Medium Account), 14 (MFI-Miami.com), 22–24 (RomspenRipoff.com); ECF No. 397-13 pp. 5, 7 (mfimiami1 Medium Account), 14–15 (MFI-Miami.com), 23–25 (RomspenRipoff.com); ECF No. 397-14 pp. 2, 5–6 (mfimiami1 Medium Account), 15–17 (MFI-Miami.com), 25–28 (RomspenRipoff.com); ECF No. 397-15 pp. 4, 6 (mfimiami1 Medium Account), 16–17 (MFI-Miami.com), 25–26 (RomspenRipoff.com); ECF No. 397-21 pp. 3–5 (RomspenRipoff.com), 12–13 (MFI-Miami.com), 21, 23–24, 26 (mfimiami1 Medium Account); ECF No. 397-22 pp. 2–3 (RomspenRipoff.com); ECF No. 397-26 p. 2 (RomspenRipoff.com); ECF No. 397-27 pp. 2 (RomspenRipoff.com), 11 (mfimiami1 Medium Account); ECF No. 397-33 pp. 2–3 (RomspenRipoff.com); ECF No. 397-41 pp. 2–3 (MFI-Miami.com); ECF No. 397-47 pp. 2 (RomspenReport.com), 10 (RomspenRipoff.com); ECF No. 397-61 pp. 1–4, 7 (RomspenReport.com); ECF No. 397-63 pp. 3–5 (MFI-Miami.com); ECF No. 397-64 pp. 2–3 (RomspenReport.com), 11–13 (RomspenRipoff.com); ECF No. 397-67 p. 3

(RomspenReport.com)]. This is false [ECF No. 396 p. 81 (stating that Romspen is not engaged in a deceptive loan-to-own toxic financing scheme)].

> **c) "Romspen waits until the last minute and does not disburse funding to the borrower. This resulted in the borrowers passing the maturity date of the agreement. Some might say that there is a difference between causation and correlation; however, the evidence is pretty strong that Romspen often does not issue the funds for an ulterior motive. What might this motivation be? One source indicated that it is directly related to two key factors: forcing a default on the loan in order to start the process of taking ownership of the project and/or increasing the interest rate to a point where the borrower is forced to go into bankruptcy. When Romspen highlights that a default has happened, the borrower has 45 days to pay the balance or foreclose on the property. The failure to pay results in an increased default rate. This toxic spiral can put the borrower in a point where they must borrow from another lender or sell property to pay the interest. In most cases 'loan-to-own' companies want the company to drowned in the endless sea of debt in order to own the project for themselves."**

[ECF No. 397-5 p. 3 (Romspen Complaints Medium Account); *see also* ECF No. 397-12 pp. 5–6 (mfimiami1 Medium Account), 15 (MFI-Miami.com), 25 (RomspenRipoff.com); ECF No. 397-13 pp. 5, 7 (mfimiami1 Medium Account), 14 (MFI-Miami.com), 25 (RomspenRipoff.com); ECF No. 397-14 pp. 7–8 (mfimiami1 Medium Account), 17 (MFI-Miami.com), 29 (RomspenRipoff.com); ECF No. 397-15 pp. 6–7 (mfimiami1 Medium Account), 16 (MFI-Miami.com), 27–28 (RomspenRipoff.com); ECF No. 397-21 pp. 5 (RomspenRipoff.com), 13 (MFI-Miami.com), 25 (mfimiami1 Medium Account); ECF No. 397-63 pp. 5–6 (MFI-Miami.com); ECF No. 397-64 pp. 1 (RomspenReport.com), 13 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 85 (stating that Romspen does not wait until the last minute to not disburse financing to the borrower)].

**d) "Romspen lures in and traps inexperienced borrowers" and/or "dupes entrepreneurs."**

[ECF No. 397-12 pp. 5 (mfimiami1 Medium Account), 15 (MFI-Miami.com), 24–25 (RomspenRipoff.com); ECF No. 397-13 pp. 5–6 (mfimiami1 Medium Account), 14 (MFI-Miami.com), 24–25 (RomspenRipoff.com); ECF No. 397-14 pp. 7 (mfimiami1 Medium Account), 17 (MFI-Miami.com), 28–29 (RomspenRipoff.com); ECF No. 397-15 pp. 6–7 (mfimiami1 Medium Account), 16 (MFI-Miami.com), 26–27 (RomspenRipoff.com); ECF No. 397-21 pp. 2–5 (RomspenRipoff.com), 11–13 (MFI-Miami.com), 24–25 (mfimiami1 Medium Account); ECF No. 397-23 p. 3 (RomspenRipoff.com), 10 (MFI-Miami.com); ECF No. 397-63 pp. 4–5 (MFI-Miami.com); ECF No. 397-64 pp. 3–4 (RomspenReport.com), 12–13 (RomspenRipoff.com)]. This is false [ECF No. 396 pp. 85 (stating that Romspen does not lure and trap inexperienced borrowers and that the vast majority of Romspen's borrowers are experienced investors), 90 (stating that Romspen is not scamming investors or running a fraudulent scheme)].

**e) "Romspen is scamming grandma and grandpa" or "elderly investors" or that Romspen investors are "fraud victims."**

[ECF No. 397-13 pp. 1–2, 4 (mfimiami1 Medium Account), 13 (MFI-Miami.com), 21–23 (RomspenRipoff.com); ECF No. 397-14 pp. 3–5 (mfimiami1 Medium Account), 16 (MFI-Miami.com), 26–27 (RomspenRipoff.com); ECF No. 397-15 pp. 3 (mfimiami1 Medium Account), 15 (MFI-Miami.com), 24 (RomspenRipoff.com); ECF No. 397-21 pp. 2–3 (RomspenRipoff.com), 11–12 (MFI-Miami.com), 21–22 (mfimiami1 Medium Account); ECF No. 397-24 (24-7 Press Release); ECF No. 397-23 pp. 2–3 (RomspenRipoff.com), 10 (MFI-Miami.com); ECF No. 397-47 pp. 2 (RomspenReport.com), 10 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 87 (stating that Romspen does not and has not scammed elderly investors)].

**f) "Romspen is defrauding elderly investors and inexperienced commercial borrowers" and Romspen "misled investors" or "lied" to investors.**

[ECF No. 397-27 pp. 2 (RomspenRipoff.com), 11 (mfimiami1 Medium Account); ECF No. 397-61 pp. 3, 5, 7 (RomspenReport.com); ECF No. 397-67 p. 3 (RomspenReport.com); ECF No. 397-68 pp. 3 (RomspenReport.com), 14 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 93 (stating that Romspen is not trapping or scamming inexperienced borrowers)].

**g) "Romspen complaints with U.S. and Canadian regulators allege fraud and misrepresentation by Romspen Investment Corporation executives."**

[ECF No. 397-28 pp. 1–2 (RomspenRipoff.com); ECF No. 397-30 p. 2 (RomspenRipoff.com)]. This is false [ECF No. 396 pp. 91–93, 114–15 (stating that Romspen has not had complaints filed by United States or Canadian regulators against it alleging fraud and/or misrepresentations by Romspen)].

**h) Romspen executives and employees are "drug addicts," "high on cocaine," "on crack," and/or "frequently engage in illicit drug use."**

[ECF No. 397-45 pp. 1–4 (RomspenReport.com); ECF No. 397-46 pp. 1–3 (RomspenReport.com); ECF No. 397-47 pp. 3 (RomspenReport.com), 11 (RomspenRipoff.com); ECF No. 397-62 pp. 3 (RomspenReport.com), 15 (MFI-Miami.com)]. This is false [ECF No. 396 pp. 138–39 (stating that Romspen executives do not engage in illicit drug use)].

**i) Romspen executives are or "could be going to prison."**

[ECF No. 397-33 p. 4 (RomspenRipoff.com); ECF No. 397-36 pp. 1–3 (RomspenRipoff.com), 9 (MFI-Miami.com); ECF No. 397-40 p. 3 (RomspenRipoff.com); ECF No. 397-41 p. 4 (MFI-Miami.com); ECF No. 397-42 p. 3 (RomspenRipoff.com); ECF No. 397-65 pp. 2 (RomspenReport.com), 11 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 149 (noting that there is no reason to believe that Romspen or its executives are the subject of anything that could lead to criminal investigations or prison time)].

**j) Romspen is "a group of Canadian conmen."**

[ECF No. 397-36 pp. 3 (RomspenRipoff.com), 10 (MFI-Miami.com)]. This is false [ECF No. 396 pp. 94 (noting that Romspen is not scamming people), 97 (stating that Romspen is not operating a Ponzi scheme or loan-to-own scheme), 154–155 (testifying that Romspen executives are not lying and hiding information from investors)].

**k) Romspen is "launder[ing] dirty money."**

[ECF No. 397-67 pp. 1–3 (RomspenReport.com)]. This is false [ECF No. 396 pp. 152–53 (stating that Romspen executives are not laundering "dirty" money)].

**l) "The Toronto headquarters of Romspen was recently raided by Quebec tax authorities for fraud and failing to pay taxes."**

[ECF No. 397-27 pp. 2 (RomspenRipoff.com), 12 (mfimiami1 Medium Account)]. This is false [ECF No. 396 p. 108 (stating that the reason Quebec tax authorities executed a search warrant was obtained in connection with an investigation into one of Romspen's borrowers and thus had nothing to do with Romspen committing fraud or not paying its taxes)].

**m) "Romspen busted conspiring with Stopa to steal homes in Florida?... The emails reportedly reveal smoking-gun evidence of Romspen funding Mark Stopa's crime family operations in Florida…. Investigators now have the evidence that Romspen has been secretly financing Stopa's fraud-on-the-court crimes for the last several years."**

[ECF No. 397-27 pp. 2 (RomspenRipoff.com), 11–13 (mfimiami1 Medium Account)]. This is false [ECF No. 396 p. 106 (stating that Romspen did not conspire with Mark Stopa in any capacity)].

**n) "Investigators believe Romspen was also colluding with Stopa to ripoff over $30 Million from several federally insured banks. Two of the victims were Deutsche Bank and Citibank."**

[ECF No. 397-27 pp. 2 (RomspenRipoff.com), 13 (mfimiami1 Medium Account)]. This is false [ECF No. 396 p. 106 (stating that Romspen did not conspire with Mark Stopa in any capacity)].

**o) "Caroline Weiss got free money thanks to the inept due diligence of lenders," naming Romspen.**

[ECF No. 397-1 pp. 4 (MFI-Miami.com), 12 (RomspenRipoff.com)]. This is false [ECF No. 396 pp. 52–53 (stating that Romspen did tons of proper due diligence in connection with this transaction)].

**p) Referring to Romspen, "it appears no one did any proper due diligence on Carol Weiss or her 'Weiss Group.'"**

[ECF No. 397-1 pp. 4 (MFI-Miami.com), 12 (RomspenRipoff.com); *see also* ECF No. 397-3 pp. 2 (MFI-Miami.com), 13 (mfimiami1 Medium Account), 20 (RomspenRipoff.com)]. This is false [ECF No. 396 pp. 52–53 (noting the efforts Romspen took in conducting diligence on this transaction)].

**q) "It also appears no one at Romspen did any basic underwriting on Carol Weiss or the property involved."**

[ECF No. 397-2 pp. 3 (MFI-Miami.com), 12 (mfimiami1 Medium Account), 18 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 56 (noting that the statement it "appears no one at Romspen did any basic underwriting on Caroline Weiss or the property involved" is false)].

**r) Referencing "Romspen's lack of due diligence and half ass underwriting."**

[ECF No. 397-3 pp. 3 (MFI-Miami.com), 11 (mfimiami1 Medium Account), 20 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 82 (noting that the above-mentioned statement is false)].

36. The Category One Statements falsely accuse Romspen of criminal conduct, fraudulent business practices, and professional incompetence. *See* FF ¶ 35 (a–r).

**CATEGORY TWO STATEMENTS**

37. The Postings contain the following false statements concerning Romspen, its business practices, and its treatment of investors and borrowers (the "Category Two Statements"):

**a. Referring to Romspen as engaged in a "shell game" or "cover up."**

[ECF No. 397-7 pp. 2–3 (mfimiami1 Medium Account), 11 (MFI-Miami.com), 19 (RomspenRipoff.com); ECF No. 397-21 pp. 2 (RomspenRipoff.com), 11 (MFI-Miami.com); ECF No. 397-22 p. 2 (RomspenRipoff.com); ECF No. 397-23 p. 2 (RomspenRipoff.com); ECF No. 397-26 p. 2 (RomspenRipoff.com); ECF No. 397-27 pp. 2 (RomspenRipoff.com), 11 (mfimiami1 Medium Account); ECF No. 397-42 pp. 2–3 (RomspenRipoff.com), 8 (MFI-Miami.com); ECF No. 397-62 pp. 2–3 (RomspenReport.com); ECF No. 397-67 p. 3 (RomspenReport.com)]. This is false [ECF No. 396 p. 151 (noting that statements accusing Romspen of playing shell games with investors' money are false)].

**b. Referring to Romspen as "the Fredo Corleone of the commercial lending industry."**

[ECF No. 397-8 pp. 2–3 (mfimiami1 Medium Account), 12 (MFI-Miami.com), 20 (RomspenRipoff.com); ECF No. 397-28 p. 2 (RomspenRipoff.com)]. That reference to being weak, dumb, and betrayal-prone is false [ECF No. 396 p. 117 (stating that the above-mentioned statement is false)].

**c. "To keep investors and their families from filing complaints with American and Canadian securities regulators, Romspen resorted to a shady lending scheme known as, 'Loan-To-Own.'"**

[ECF No. 397-13 pp. 5 (mfimiami1 Medium Account), 14 (MFI-Miami.com), 24 (RomspenRipoff.com); ECF No. 397-14 pp. 6 (mfimiami1 Medium Account), 17 (MFI-Miami.com), 28 (RomspenRipoff.com); ECF No. 397-15 pp. 6 (mfimiami1 Medium Account), 16 (MFI-Miami.com), 26 (RomspenRipoff.com); ECF No. 397-21 pp. 12 (MFI-Miami.com), 24

(mfimiami1 Medium Account)]. This is false [ECF No. 396 p. 91 (noting that the above-mentioned statement is false)].

**d. Referring to Romspen as "teetering on insolvency," on the "verge of insolvency," "headed for Bankruptcy," or "in a death spiral."**

[ECF No. 397-6 pp. 4 (mfimiami1 Medium Account), 13 (MFI-Miami.com), 21 (RomspenRipoff.com); ECF No. 397-7 pp. 4 (mfimiami1 Medium Account), 11 (MFI-Miami.com), 20 (RomspenRipoff.com); ECF No. 397-18 p. 2 (RomspenRipoff.com); ECF No. 397-33 pp. 2, 4 (RomspenRipoff.com); ECF No. 397-36 pp. 3 (RomspenRipoff.com), 9 (MFI-Miami.com); ECF No. 397-37 p. 2 (RomspenRipoff.com); ECF No. 397-38 p. 1 (MFI-Miami.com); ECF No. 397-40 pp. 1–2 (RomspenRipoff.com); ECF No. 397-41 pp. 2–4 (MFI-Miami.com); ECF No. 397-42 pp. 2 (RomspenRipoff.com), 8 (MFI-Miami.com); ECF No. 397-68 pp. 5 (RomspenReport.com), 16 (RomspenRipoff.com); ECF No. 397-65 pp. 2 (RomspenReport.com), 11 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 75 (stating that Romspen is not on the brink of insolvency and is not heading for bankruptcy)].

**e. Referring to Romspen as a "roach motel of commercial lending" and/or where investors invest money but never receive their money back.**

[ECF No. 397-6 pp. 2–3 (mfimiami1 Medium Account), 13 (MFI-Miami.com), 20–24 (RomspenRipoff.com); ECF No. 397-12 pp. 2 (mfimiami1 Medium Account), 14 (MFI-Miami.com), 23 (RomspenRipoff.com); ECF No. 397-15 pp. 4 (mfimiami1 Medium Account), 15 (MFI-Miami.com), 25 (RomspenRipoff.com); ECF No. 397-22 p. 3 (RomspenRipoff.com); ECF No. 397-29 p. 2 (RomspenRipoff.com); ECF No. 397-61 p. 1 (RomspenReport.com)]. This is false [ECF No. 396 pp. 118–19 (noting that statements that Romspen does not give investor money back are false)].

**f. Referring to Romspen as engaged in "toxic financing."**

[ECF No. 397-5 p. 2 (Romspen Complaints Medium Account)]. This is false [ECF No. 396 p. 81 (stating that Romspen is not involved in a "toxic financing" scheme)].

**g. "Romspen and their investors are out $21 million" and Romspen would have "zero recourse" with respect to Blue Lagoon/Caroline Weiss loan and implying Romspen would have no one to collect the money from.**

[ECF No. 397-1 pp. 4 (MFI-Miami.com), 12 (RomspenRipoff.com); ECF No. 397-2 pp. 3 (MFI-Miami.com), 12 (mfimiami1 Medium Account); ECF No. 397-12 pp. 3–4 (mfimiami1 Medium Account), 11 (MFI-Miami.com), 19 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 79 (noting that the above-mentioned statement is false); ECF Nos. 399-1, 399-2 (state court records awarding Romspen almost 21 million dollars in connection with Blue Lagoon/Caroline Weiss loan)].

**h. "Romspen's lien on the contested properties [Blue Lagoon] is now void."**

[ECF No. 397-11 pp. 4 (mfimiami1 Medium Account), 11 (MFI-Miami.com), 20 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 80 (noting that the above-mentioned statement is false)].

**i. "We found some irregularities in the $21.3 million dollar loan. Irregularities that call into question Romspen lending practices."**

[ECF No. 397-19 pp. 2 (mfimiami1 Medium Account), 11 (MFI-Miami.com), 19 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 55 (noting that the above-mentioned statement is false)].

**j. "Romspen executives plan to secretly liquidate the company's non-performing assets without paying investors."**

[ECF No. 397-65 pp. 1–4 (RomspenReport.com), 10–13 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 150 (noting that the above-mentioned statement is false)].

**k. Rhetorically asking, "Were Romspen underwriters blind and clueless when it came to Caroline Weiss?"**

[ECF No. 397-2 pp. 3 (MFI-Miami.com), 12 (mfimiami1 Medium Account), 18 (RomspenRipoff.com)]. This is false [ECF No. 396 p. 56 (noting that the above-mentioned statement is false)].

**D. *Publication, Reach, and Lack of Factual Basis***

38. Defendants published and republished the accusations across more than 175 webpages and related postings viewable by third parties, while cross-linking the Websites to amplify the same allegations. *See* FF ¶¶ 28–33.

39. Some of the Postings were viewed by Romspen investors, who contacted Romspen about their concerns regarding the Postings [ECF Nos. 397-55, 397-56, 397-57, 397-58, 397-69].

40. As a result of the publication of the **Category One Statements** and **Category Two Statements**, Romspen has been subject to undeserved scrutiny from various investors and others about the Category One Statements and Category Two Statements, and has been forced to spend time and money to attempt to address and overcome questions and concerns about its business performance [ECF No. 396 pp. 44 (noting that Romspen first became aware of Defendants' articles upon an investor inquiry into the validity of one of Defendant's articles), 46 (stating that some of Romspen's investors called Romspen to inquire about Defendants' articles), 160 (noting that Romspen has received inquiries from investors referencing the articles at issue in this matter), 161 (referencing inquiries made by an investor, banks, and a borrower about Defendants' articles), 162 (noting that responding to such inquiries consumes time, effort and money in the form of legal fees and otherwise), 167 (referring to an investor expressing concern on the Blue Lagoon Project, in part, because of Defendants' articles), 168 (investor inquiry referencing one of Defendants' articles asking "is any of this true?"), 171, 173–174, 189–190 (noting that an investor inquired about

litigation on the Blue Lagoon loan and false allegations that Romspen had zero recourse on this loan), 190–191 (noting that an investor expressed concern and inquired about one of Defendants' articles titled "Romspen is scamming grandma and grandpa"); *see also* ECF No. 397-55 (email noting investor inquiry about whether Romspen has a zero recourse loan on the Blue Lagoon property); ECF No. 397-56 (noting multiple investor inquiries regarding Defendants' articles on the Blue Lagoon loan); ECF No. 397-57 (same); ECF No. 397-58 (investor sending Romspen Defendants' article "Romspen is scamming grandma and grandpa" via email); ECF No. 397-59 (investor emailing Romspen one of Defendants' articles asking "is any of this true?")].

41. During discovery, Defendants suppressed analytics data they previously claimed to have, depriving Romspen and the Court of the ability to assess the full scope of the reach of the Postings, and thus the full harm to Romspen [*Compare* ECF No. 397-39 p. 2 ("Our analytics show people are finding us") *with* ECF No. 397-50 (Dibert and LLC Defendants' Responses to Interrogatory No. 9 stating they have no information regarding website traffic and viewing statistics); ECF No. 397-51 (Dibert and LLC Defendants' Responses to Requests for Production Nos. 5, 6, 28 stating they have no documents related to metrics involving the Postings and website traffic, among other things)].

42. Defendants never contacted Romspen before publishing any of the Postings to seek comment, verify their allegations, or obtain Romspen's side of the story [ECF No. 396 p. 157].

43. Defendants fabricated "sources," including Romspen investors, former and current Romspen employees, and employees at Romspen's outside legal counsel, Bryan Cave Leighton Paisner LLP, and wrote in the plural and under fictitious names to suggest that multiple contributors stood behind the accusations (*Compare, e.g.,* ECF No. 397-5 pp. 2 ("According to one source . . ."), 3 ("One source indicated . . ."); ECF No. 397-12 pp. 5, 15, 24, 25 ("According

to one source . . ."); ECF No. 397-13 pp. 6, 14, 24 ("According to one source . . ."), ECF No. 397-14 pp. 3 ("Investors we have spoken with say . . ."), 7, 17, 28 ("According to one source . . . "); ECF No. 397-15 pp. 7, 16 ("According to one source . . ."), 8, 17, 27 ("One source indicated . . ."); ECF No. 397-27 pp. 3, 12, 14 ("Sources say . . ."); ECF No. 397-31 pp. 4 ("[I]nside sources at the Chicago office of Bryan Cave also say . . ."), 11, 22 ("Our sources at the Chicago office of Bryan Cave also say . . ."); ECF No. 397-36 pp. 3, 10 ("Several senior citizen investors who were at the 2024 meeting contacted RomspenRipoff.com. they informed us . . ."); ECF No. 397-39 p. 2 ("Angry Romspen Investors have been emailing RomspenRipoff.com. . .. RomspenRipoff.com receives 6-8 emails a day from investors . . ."); ECF No. 397-43 p. 3 ("Sources at BCLP say the morbidly obese lawyer . . ."); ECF No. 397-45 p. 3 ("We assembled a focus group . . ."); ECF No. 397-63 p. 4 ("According to one source . . ."); ECF No. 397-64 p. 3 ("According to one source . . ."); ECF No. 397-65 pp. 3, 12 ("Sources at Romspen tell us . . ."), 4, 13 ("Our sources at Romspen also tell us . . ."); ECF No. 397-68 p. 5 ("RomspenReport editors have spoken to seasoned and experienced litigators . . ."), *with* ECF No. 397-50 pp. 1–4 (Dibert and LLC Defendants' Responses to Interrogatories Nos. 2, 3, 5, 6, 9 identifying no sources or communications regarding Romspen or with investors); ECF No. 397-51 pp. 2–3, 5, 9–12, 25–26 (Dibert and LLC Defendants' Responses to Requests for Production Nos. 3, 4, 11, 22, 23, 24, 25, 26, 29, 45 identifying no communications regarding Romspen, with investors, or relating to research for Postings)].

44. In discovery, however, Defendants identified no communications with any Romspen investor, no communications with any current or former Romspen employee, no communications with personnel at Romspen's outside counsel, and no documents reflecting research or source materials supporting the challenged accusations [ECF No. 397-50 pp. 1–5 (Dibert and LLC Defendants' Responses to Interrogatories Nos. 2, 3, 5, 6, 9 identifying no sources

or communications regarding Romspen or with investors); ECF No. 397-51 pp. 2–3, 5, 9–12, 22–23, 25–26 (Dibert and LLC Defendants' Responses to Requests for Production Nos. 3, 4, 11, 22, 23, 24, 25, 26, 29, 38, 45 identifying no direct communications regarding Romspen, with investors, or relating to research for Postings)].

45. Dibert authored, published, and re-published the Postings without having any personal knowledge of, factual basis for, or evidence to support the truth of the Postings [ECF No. 397-51 p. 11 (responding to Request for Production No. 26 stating "none" when asked for "[a]ll [d]ocuments relating to [y]our knowledge of the truth or falsity of the information contained in the postings")].

**E. *Continued and Escalating Publication After Notice***

46. Dibert continued to author, publish, and re-publish the Postings listed above even after Dibert and MFI-Miami NM LLC received a cease-and-desist letter from Romspen that gave Defendants formal notice of the falsity of the posts [ECF No. 397-54; ECF No. 396 p. 12] and after Defendants received notice of this lawsuit.

47. As Romspen pursued its legal rights, Dibert increased both the frequency of the postings at issue and the severity of the accusations they contained [ECF No. 396 pp. 162–163].

48. Dibert also continued re-publishing Blue Lagoon loan accusations after courts entered orders recognizing Romspen's mortgage as valid and enforceable, awarding Romspen foreclosure relief, and recognizing Romspen's secured claim as fully secured. *See* FF ¶¶ 14–16, 32–33.

49. Dibert also demanded payment in exchange for removing the articles and threatened that the articles would remain online regardless of any judgment [ECF No. 397-66 p. 2 (email from Dibert stating "Besides, even if on the off chance you get a judgment against me, you

will never collect it. **Your judgment won't be worth the paper it's written on**. The MFI-Miami website will still be active. The articles will still be up for the world to see. Why? Well, it's pretty obvious. The US courts don't have jurisdiction over the websites and I no longer live in the U.S.")].

**F. *Defendants' State of Mind, Motive, and Culpability***

50. Dibert deliberately used fictitious authors, fabricated sources, and repeated republication to increase the apparent credibility and reach of the accusations against Romspen. *See* FF ¶¶ 31, 43–45, 46–49.

51. Dibert knew or consciously disregarded that there was a high likelihood that the Category One Statements and Category Two Statements would injure Romspen's reputation and business interests and consciously disregarded that probability. *See* FF ¶¶ 29, 39–40, 45–49, 57.

52. Dibert intended to harm Romspen with the Postings. *See* FF ¶¶ 28–29, 47, 49, 57.

53. Dibert knew or consciously disregarded that the authorship, publication, and re-publication of the Postings about Romspen were wrongful. *See* FF ¶¶ 45–49.

54. Dibert's conduct was highly culpable and reprehensible, and indicated a clear disregard for Romspen's rights. *See* FF ¶¶ 31, 43–53.

**G. *Facts Relevant to Plaintiff's Public-Figure Status***

55. Romspen is a private, non-bank commercial mortgage and investment firm operating in a specialized market. Although Romspen manages substantial assets and serves investors, borrowers, family offices, foundations, endowments, and pension plans, it does not market itself to the general public or occupy a position of pervasive fame or notoriety [ECF No. 396 pp. 22, 41–42; ECF No. 397-6 pp. 5, 22 (writing, "Romspen is a private lender"); ECF No. 397-8 p. 2 (writing, "Most Americans outside the world of commercial finance have never heard of Romspen")].

56. The record does not show that Romspen voluntarily thrust itself into a public controversy concerning the Blue Lagoon loan, investor redemptions, or the subjects of the Postings. Rather, Romspen's communications about those matters were directed to existing stakeholders or made in the course of ordinary business and litigation, and later in response to Defendants' accusations [ECF No. 396 pp. 41–42, 44, 46, 160–62, 167–68, 189–91].

57. The websites did not present information in a neutral news reporting format and specifically focused on publishing accusatory content concerning Romspen, its executives, and its counsel [ECF No. 396 pp. 98, 104–06, 118, 138, 151–55, 158–59, 213–14].

**H. *Harm to Romspen and Efforts to Mitigate***

58. Since December 2022, Romspen has made attempts to obtain Dibert's voluntary removal and discontinuation of the Category One Statements and Category Two Statements [*see, e.g.*, ECF No. 397-54], but Dibert has refused to do so [ECF No. 396 p. 58].

59. Because of Defendants' Postings and their continued presence online, Romspen was forced to bring legal claims against Defendants, all at significant expense, to attempt to mitigate the harm of the Postings [ECF No. 396 p. 162].

60. The Postings struck at the core of Romspen's ability to maintain investor confidence, on which its business depends. *See* FF ¶¶ 4–6. As set forth above, investors who encountered the Postings contacted Romspen to ask whether the accusations were true and expressed concern about the safety of their investments. *See* FF ¶ 39.

## II. CONCLUSIONS OF LAW

**A. *This Court Has Jurisdiction and Venue Is Proper***

1. The Court has personal jurisdiction over the parties and has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a). Complete diversity exists, *see* FF ¶¶ 3,

17–21, and the amount in controversy requirement is met [ECF No. 60 (noting that the amount in controversy exceeds $75,000)].

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391 [ECF No. 96, p. 6 (Order denying Defendants' motion to dismiss based on improper venue)].

**B. *Dibert Is Liable for the Actions of the LLC Defendants***

3. "It is black letter law in Florida that to disregard this corporate fiction and hold the corporation's owners liable—to pierce the corporate veil—the plaintiff that: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant."[8] *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011) (quotation omitted).

4. The record establishes each element of the alter-ego test. First, Dibert dominated and controlled each LLC Defendant to such an extent that none had an independent existence. Dibert was the sole member, sole owner, and sole person associated with each LLC; the LLCs had no employees other than Dibert, maintained no separate financial records, filed no tax returns, and held no separate bank accounts. *See* FF ¶¶ 18–20, 24. Second, Dibert used the corporate form for an improper purpose: he used the LLCs to conceal that he was the sole originator of the defamatory content and to fabricate the appearance of institutional credibility behind what was, in reality, a one-person operation. *See* FF ¶ 25. Third, that improper use caused injury to Romspen, whose

[8] "It is well established that when a federal court considers a case that arises under its diversity jurisdiction, the court is to apply state substantive law and federal procedural law." *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357 (11th Cir. 2014). Thus, Florida law provides the "substantive law to the merits of [p]laintiff's defamation claim." *Duffy v. Fox News Network, LLC*, No. 6:14-CV-1545, 2015 WL 5009101, at *3 (M.D. Fla. Aug. 21, 2015).

reputation and business were harmed by the defamatory publications issued through the LLC-operated websites. *See* FF ¶¶ 39–40, 58–60. Accordingly, Dibert is individually liable for all acts of the LLC Defendants. *Id.*

**C. *Defendants Are Liable for Defamation and Defamation Per Se***

5. "Defamation has the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).

**Publication**

6. Under Florida law, the publication element of a defamation claim is satisfied when a defamatory statement posted on the internet is accessed by a third party. *See Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1214–15 (Fla. 2010) ("When the posting is then accessed by a third party in Florida, the material has been published in Florida." (quotation omitted)).

7. Defendants published the Postings because they were accessed by one or more third parties, as demonstrated by the investor inquiries concerning the Postings. *See* FF ¶¶ 38–39.

**Nature of Statements**

8. "[A] defamatory statement is one that tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." *Jews for Jesus*, 997 So. 2d at 1108–09.

9. "To determine if a statement is defamatory, it must be considered in the context of the publication." *Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) (quotations omitted).

10. A statement is defamatory per se if "(1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953). This includes a publication that "imputes to another a criminal offense amounting to a felony, or conduct, characteristics, or conditions incompatible with the proper exercise of one's lawful business, trade, profession, or office." *Madsen v. Buie*, 454 So. 2d 727, 729–30 (Fla. Dist. Ct. App. 1984). A statement tends to injure one in his trade or profession when it imputes "conduct, characteristics, or a condition incompatible with the proper exercise of [one's] lawful business, trade, profession, or office." *Sultan v. Walgreen Co.*, 324 So. 3d 563, 565 (Fla. Dist. Ct. App. 2021) (quoting *Perry v. Cosgrove*, 464 So. 2d 664, 666 (Fla. Dist. Ct. App. 1985)). "Statements regarding fraud and dishonesty are per se defamatory as they impute conduct/characteristics incompatible with the proper exercise of his lawful business, trade, profession, or office." *Happy Tax Franchising, LLC v. Hill*, No. 19-24539, 2021 WL 3811041, at *5-6 (S.D. Fla. June 7, 2021) (quotations omitted)).

11. Florida recognizes "defamation by implication," which arises when "the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, [in which case] he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.'" *Jews for Jesus*, 997 So. 2d at 1108.

12. A statement is not protected as pure opinion if "facts" upon which the opinion is based are stated in the article, but those "facts" are either incomplete or incorrect, or the speaker's assessment of them is erroneous. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990).

13. The Postings, all of which identify Romspen by name, were "about" Romspen. FF ¶¶ 35, 37.

14. The Postings communicated false statements about Romspen. FF ¶¶ 35–37.

15. The Category One Statements are defamatory per se because: (a) they falsely communicate that Romspen has engaged in, or is engaging in, criminal conduct that amounts to a felony; (b) tend to subject Romspen to hatred, distrust, ridicule, contempt, or disgrace; (c) tend to injure Romspen in its business as a commercial lender and investment fund; and/or (d) impute conduct or characteristics incompatible with the proper exercise of Romspen's business. *See* FF ¶¶ 35–36.

16. The Category Two Statements are defamatory because they are false and tend to harm the reputation of Romspen by lowering it in the estimation of Romspen's industry. *See* FF ¶¶ 35–36.

**Injury**

17. Statements that are defamatory per se are "so obviously defamatory" and "damaging to reputation" that they "give[] rise to an absolute presumption both of malice and damage." *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. Dist. Ct. App. 1973).

18. The Postings particularly threatened Romspen because as a commercial mortgage investment fund, the lifeblood of Romspen's business is to consistently attract and retain investors. *See* FF ¶¶ 5–7.

19. The Postings have a high likelihood of eroding investor and borrower confidence and trust in Romspen. *See* FF ¶¶ 5–7 (noting the importance of trust, diligence, and certain other characteristics in retaining and attracting investors), 35–37 (postings accusing Romspen of fraud, incompetence, and making other accusations that are directly opposed to the characteristics necessary to attract and retain investors), 43 (noting that Dibert's postings contained fabricated sources he claimed were investors and/or insiders at Romspen), 50 (finding that the fabricated sources were designed to increase the apparent credibility and reach of the accusations against Romspen).

20. The Postings injured Romspen's reputation and business interests. *See* FF ¶¶ 39–40 (referencing various investor inquiries asking about the Postings); *see also* CL¶ 19 (giving an overview as to how the Postings have a high likelihood of harming Romspen).

21. Despite Plaintiff's reasonable efforts in discovery to obtain Defendants' viewership analytics for the Postings, Defendants blatantly failed to produce any data on that topic. *See* FF ¶ 41 (noting that Defendants failed to provide any of the viewership data they claimed to have despite Plaintiff's efforts to obtain it).

**Negligence, Reckless Disregard, and Malice**

22. "Public figures" for purposes of defamation come in two types. "General public figures are individuals who, by reason of fame or notoriety in a community, will in all cases be required to prove actual malice." *Turner v. Wells,* 879 F.3d 1254, 1272 (11th Cir. 2018). "Limited public figures, on the other hand, are individuals who have thrust themselves forward in a particular public controversy and are therefore required to prove actual malice only in regard to certain issues." *Id*. "A public controversy is any topic upon which sizeable segments of society have different, strongly held views." *Young v. Kopchak*, 368 So. 3d 1001, 1006 (Fla. Dist. Ct.

App. 2023) (quotation omitted). To determine whether a specific individual is a limited public figure, "the court must determine whether the individual played a central role in the controversy" and "whether the alleged defamation was germane to the individual's role in the controversy." *Turner*, 879 F.3d at 1272. Whether a plaintiff is a public figure is a question of law for the Court. *Id.* at 1271–73.

23. Romspen is not a general purpose public figure. The record does not establish that Romspen has such pervasive fame or notoriety that it should be treated as a public figure in any case. *Id.* at 1271–72. Nor can Romspen be deemed to occupy a position of such persuasive power and influence solely because it is a high value investment fund. *See* FF ¶ 55; *see also Techtronic Indus. Co. Ltd. v. Bonilla*, No. 23-CV-1734, 2023 WL 8543762, at *5 (M.D. Fla. Dec. 11, 2023) ("Although TTI alleges it is a large multi-billion-dollar company, the Court cannot say, based on the facts as alleged, that TTI occupies a position of such persuasive power, nor that it appears to have 'such fame and notoriety' that it would be considered a public figure in any case.").

24. Romspen is also not a limited-purpose public figure. The record does not establish any preexisting public controversy concerning Romspen because the Postings address commercial financings and investment disputes, not issues over "which sizeable segments of society have different, strongly held views." *Young*, 368 So. 3d at1006. *See* FF ¶ 56. Its later efforts to answer investor inquiries and defend itself against Defendants' accusations do not convert it into a public figure. *See Long v. Cooper*, 848 F.2d 1202, 1206 (11th Cir. 1988) (concluding that Plaintiffs were not a public figure because they "neither thrust themselves to the forefront nor were drawn into a preexisting public controversy in an effort to influence its outcome" and that their "prominent position in the industry, standing alone, does not create a sufficient nexus" between plaintiffs and the purported controversy).

25. “The terms media and non-media defendants are meant to distinguish between third parties who are not engaged in the dissemination of news and information through the news and broadcast media from those who are so engaged.” *Zelinka v. Americare Healthscan, Inc.*, 763 So. 2d 1173, 1175 (Fla. Dist. Ct. App. 2000). In determining whether a defendant qualifies as a media defendant, courts consider whether the publication is “operated to further the free dissemination of information or disinterested and neutral commentary or editorializing as to matters of public interest.” *McQueen v. Baskin*, 377 So. 3d 170, 179–80 (Fla. Dist. Ct. App. 2023).

26. Defendants are not “media defendants.” Defendants’ Websites were not operated to further the free dissemination of information or disinterested and neutral commentary or covering matters of keen public interest. *See* FF ¶¶ 29 (finding that Dibert’s blog helps promote his business venture), 57 (finding that the Websites did not follow traditional journalistic practices in connection with the Postings and that the Postings uniquely targeted Romspen). Rather, the Websites focused on publishing repeated accusatory content concerning Romspen, its executives, and its counsel [ECF No. 396 pp. 98, 104–06, 118, 138, 158–59].

27. Defendants were negligent in authoring, publishing, and republishing the Postings, including by virtue of Defendants’ failure to conduct reasonable diligence into the truth or falsity of the Postings. *See* FF ¶¶ 42–45.

28. A public-figure plaintiff must prove actual malice by clear and convincing evidence. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). Actual malice requires a plaintiff to put forth “facts sufficient to give rise to a reasonable inference that the false statement was made with knowledge that it was false or with reckless disregard of whether it was false or not.” *Turner*, 879 F.3d at 1273.

29. The Court's ultimate conclusion—that Romspen has established its Defamation Per Se and Defamation claims—would still be true even if this Court concluded that Romspen is a public-figure. Here, Defendants identified none of the sources referenced in the Postings. They fabricated multiple authors and "sources" to create a false appearance of corroboration, identified no supporting documents or communications in discovery, had no personal knowledge of the accusations they published, never sought Romspen's comment, and nonetheless repeatedly published as fact, accusations of fraud, Ponzi scheme conduct, money laundering, drug use, sham underwriting, and criminal investigations. *See* FF ¶¶ 35, 37, 42–45. On this record, the Court finds that Defendants knew many of the challenged statements were false and, at minimum, actually entertained serious doubts as to the truth of the remainder but recklessly published and republished them anyway.

30. Defendants' continued republication after receipt of the cease-and-desist letter, after notice of this action, and after judicial rulings disproved key Blue Lagoon loan accusations further confirms actual malice. *See* FF ¶¶ 46–48. Defendants' financial motive and desire to injure Romspen do not alone establish actual malice, but they corroborate the Court's finding that the Postings were not published in good-faith error. *See* FF ¶¶ 29, 52. Accordingly, even if Romspen were treated as a public figure, Romspen has proven actual malice by clear and convincing evidence, and its defamation and defamation per se claims still succeed.

**D. *Dibert's Affirmative Defenses Have Been Waived and Abandoned***

31. Dibert has abandoned or waived his affirmative defenses for failure to submit any evidence to support them.[9] *See, e.g., Houchins as Tr. of Sharmin Inghram Family Ins. Tr. v. Weiss,*

[9] To be clear, the Court's Order precluding Dibert from submitting documentary or testimonial evidence at trial does not change this analysis [ECF No. 387]. That sanction, significant as it was, was the only available option left to provide even a modicum of fairness to this proceeding in light

No. 21-cv-81046, 2025 WL 424619, at *6 (S.D. Fla. Jan. 22, 2025) ("Further, any potential defenses have been waived as the Inghrams failed to appear at the duly noticed bench trial and failed to present any evidence whatsoever in support of any defense."); *Walsh v. Alarm Sec. Grp., Inc.*, 95 F. App'x 399, 403 (3d Cir. 2004) ("[Defendant] waived this affirmative defense when it failed to appear at trial, and the district court should not have asserted [defendant]'s defense *sua sponte* and mitigated the damages for it."); *see also* ECF No. 269 ("[T]he Court's review of the docket strongly suggests that the pro se Defendant in this case does not intend to appear at trial," which would mean that "all of his affirmative defenses will necessarily fail because he will not introduce proof in support of the same.")].

**E. *The LLC Defendants' Default Establishes Liability***

32. By virtue of the Clerk's entry of default against the LLC Defendants, the Court deems the SAC's well-pleaded factual allegations admitted by the LLC Defendants. *See, e.g.*, *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987); *see also Malletier v. Individuals, Bus. Entities, or Unincorporated Ass'ns*, No. 23-61421-CV, 2024 WL 4372102, at *2 (S.D. Fla. Jan. 26, 2024) (citing *Buchanan* for the proposition that "[t]he effect of a clerk's default is that all of plaintiff's well-pleaded allegations are deemed admitted"); *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009).

33. The LLC Defendants' resulting admissions thus include: (a) Defendants operate MFI-Miami.com [ECF No. 60]; (b) beginning in May 2022, MFI-Miami.com began publishing false and misleading content about Romspen [ECF No. 60]; (c) the LLC Defendants had actual

---

of Dibert's egregious and brazen history of cumulative noncompliance with Court orders, discovery rules, and the Federal Rules of Civil Procedure over the course of this proceeding [ECF No. 387]. Dibert's willful and bad-faith noncompliance, including his failure to appear for the hearing to discuss the matter, is catalogued in detail in the Court's January 19, 2026 Order [ECF No. 387].

knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Romspen would result [ECF No. 60]; and (d) the false and defamatory statements contained in the Postings expressly impugned Romspen's performance of its trade or business [ECF No. 60].

**F. *Romspen Is Entitled to Injunctive Relief***

34. "[I]n defamation cases, there is a strong presumption against injunctive relief." *Santilli v. Van Erp,* No. 17-CV-179733, 2018 WL 2152095, at *1 (M.D. Fla. May 10, 2018). This is because a preliminary injunction against allegedly defamatory speech constitutes a prior restraint, *id.*, and "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976). As such, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Weaver v. Bonner,* 309 F.3d 1312, 1323 (11th Cir. 2002).

35. However, a narrowly tailored injunction prohibiting speech already found defamatory is not an invalid prior restraint when a judgment for monetary damages would not afford the plaintiff effective relief from a continuing pattern of defamation.[10] *See Saadi v. Maroun*, 2009 WL 3617788, at *3 (M.D. Fla. Nov. 2, 2009) (citing *Balboa Island Vill. Inn, Inc. v. Lemen*, 40 Cal. 4th 1141, 156 P.3d 339 (2007) (enjoining Defendant from continuing to repeat or publish statements found to be defamatory)); *Ward v. Triple Canopy, Inc.*, No. 17-cv-80224, 2017 WL 3149431, at *5 (M.D. Fla. July 25, 2017) ("[A] narrowly tailored injunction prohibiting speech already found defamatory by the jury is not an invalid prior restraint when a judgment for monetary

[10] Any injunctive relief in a defamation action must be narrowly tailored to avoid becoming an impermissible prior restraint. Thus, the proper scope of relief is limited to prohibiting repetition or republication of the specific statements already adjudicated defamatory, not to restraining speech more generally. *See Saadi*, 2009 WL 3617788, at *3.

damages would not afford the plaintiff effective relief from a continuing pattern of defamation.”). Under federal law, “[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.” *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Florida law similarly provides that, “[t]o obtain a permanent injunction, the petitioner must establish a clear legal right, an inadequate remedy at law and that irreparable harm will arise absent injunctive relief.” *Liberty Counsel v. Fla. Bar Bd. of Governors*, 12 So. 3d 183, 186 n.7 (Fla. 2009) (quotation omitted). A damages award for past harm does not preclude injunctive relief against future harm because “[t]he sole function of an action for injunction is to forestall future violations,” and it “does not prevent concurrent or later remedy for past violations.” *United States v. Or. State Med. Soc’y*, 343 U.S. 326, 333 (1952). *See, e.g.*, *Saadi*, 2009 WL 3617788, at *1–3 (granting permanent injunction where damages judgment did not provide complete relief from continuing defamation); *Fed. Trade Comm’n v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1288 (S.D. Fla. 2019) (granting permanent injunction to “protect consumers going forward” and entering money judgment for past violations).

36. Romspen has established entitlement to the narrowly tailored permanent injunctive relief set out below.

37. The specific Category One Statements and Category Two Statements identified above continue to be publicly available on the Websites at the web addresses previously identified, and they remain accessible to anyone with an internet connection. *See* FF ¶ 28, 32, 35, 37, 58. Their continued availability does not merely memorialize a past wrong but rather perpetuates an

ongoing one. So long as these materials remain accessible on the internet, Romspen must continue to answer and rebut the same false accusations to investors, borrowers, and other readers who encounter them.

38. Injunctive relief is necessary to prevent future additional injury and irreparable harm to Romspen's reputation within the commercial mortgage lending and investment industry, and the public generally. The need for injunctive relief is especially compelling where, as here, "mere damages will not stop Defendant[s] from continuing [their] ongoing digital harassment campaign against Plaintiff[] and [its] affiliates." *Signorello v. Murphy*, No. 24-CV-22206, 2025 WL 3297828, at *3 (S.D. Fla. Sept. 17, 2025).

39. The need for prospective relief is reinforced by Defendant Dibert's conduct during this litigation. The record reflects that Defendant Dibert increased both the frequency of the postings at issue and the severity of the accusations contained therein as Romspen pursued its rights. *See* FF ¶ 47. That escalation supports concluding that damages alone will not deter further republication and that, absent injunctive relief, the defamatory campaign is likely to continue.

40. Dibert has also stated that regardless of what the Court decides, the Postings and websites will still be active. *See* FF ¶ 49 (Dibert stating that regardless of how the Court rules the websites and Postings will still be active for the world to see).

41. An injunction is further warranted given the difficulty of adequately measuring the harm Romspen has suffered as a result of Defendants' articles. Harm to commercial reputation and goodwill in an industry that depends heavily on trust and counterparties' confidence is diffuse, cumulative, and inherently difficult to quantify; the Court cannot determine with any sort of certainty how many prospective investors, borrowers, or business counterparties declined to deal with Romspen after encountering Defendants' Postings. FF ¶ 41. *See Yorktown Sys. Grp. Inc. v.*

*Threat Tec LLC*, 108 F.4th 1287, 1296–97 (11th Cir. 2024) (recognizing that "[e]vidence of intangible harms . . . such as potential damage to [a] business reputation" supports irreparable harm where there is "difficulty, if not impossibility, of quantifying in monetary terms" the injury).

42. The inadequacy of monetary relief is compounded by Defendants' own admissions. Defendants have claimed to have no assets and Dibert has further claimed he is "judgment proof." *See* FF ¶ 26. Absent an injunction, Defendants, as "impecunious defamer[s]," would be "undeterrable" and "will be free to repeat all their defamatory statements with impunity." *McCarthy v. Fuller*, 810 F.3d 456, 462 (7th Cir. 2015). Defendants' claimed inability—or unwillingness—to satisfy a judgment materially reinforces the need for prospective injunctive relief.

43. The narrowly tailored injunction entered below is not an impermissible prior restraint. This Order does not enjoin speech merely alleged to be defamatory; it adjudicates the specific Postings and Statements at issue to be false and defamatory and restricts only their continued publication, repetition, or republication.[11] That is the constitutionally critical distinction. "A narrowly tailored injunction prohibiting speech already found defamatory by the [finder of fact] is not an invalid prior restraint when a judgment for monetary damages would not afford the plaintiff effective relief from a continuing pattern of defamation." *Deligdish v. Bender*, No. 23-cv-417, 2023 WL 5016547, at *12 (M.D. Fla. Aug. 7, 2023) (quotation omitted).

44. Balancing the equities favors entry of an injunction as Defendants would not suffer harm from having to permanently cease their tortious, dishonest, and harmful attacks against Romspen; and an injunction serves the public interest by preventing potential and actual Romspen

[11] The Court does not merely assume defamation for purposes of interim relief; it makes an actual merits adjudication on a full trial record.

investors, borrowers, and other stakeholders from being confused and misled by false information about Romspen. *See, e.g.*, *Svanaco, Inc. v. Brand*, 2022 WL 22894739, at*3 (N.D. Ill. 2022) (stating that "an injunction serves the public interest by preventing potential Svanaco customers from being confused and misled by false information about Svanaco").

45. Romspen is entitled to an order requiring Defendants immediately to remove from the identified websites, accounts, and URLs the specific Postings identified in FF ¶¶ 32–34 to the extent those Postings contain the Category One Statements and Category Two Statements adjudicated in this Order, including on all websites (including www.MFI-Miami.com, www.RomspenRipoff.com, www.RomspenReport.com, and the "mfimiami1" and "Romspen Complaints" accounts on www.Medium.com). *See Signorello*, 2025 WL 3297828, at *4 (granting limited permanent injunction requiring defendant to "take down the existing internet posts" reflecting assertions specifically adjudicated defamatory); *Friedman v. Schiano*, No. 16-CV-81975, 2017 WL 2901211, at *3 (S.D. Fla. Jan. 9, 2017) (granting injunction requiring defamatory internet posts to be removed and defendant to cease publishing new statements accusing plaintiffs of criminality).

46. Romspen is further entitled to an order prohibiting Defendants from continuing to publish, repeat, or republish the specific Category One Statements and Category Two Statements adjudicated in this Order, including by reposting the same statements on different websites, accounts, or URLs. *See Saadi*, 2009 WL 3617788, at *3 (enjoining continued speech that the court found to be defamatory; "[defendant] is enjoined from republishing in any manner any statement that [plaintiff] is a terrorist").

47. Romspen is also entitled to an order requiring the takedown of the website www.RomspenRipoff.com. Even if the uniform resource locator ("URL") is not itself defamatory

per se (although a case can be made for that proposition), the Court is authorized to review the contents of the URL in combination with the materials on the website to which it corresponds and the overall context of the website. For all of the reasons laid forth in this Order, it is obvious that the entire purpose, scope, and nature of www.RomspenRipoff.com is to defame Romspen by serving as a dedicated vehicle for the publication, republication, and amplification of the false and defamatory statements adjudicated in this Order. It is also self-evident, based on all of the factual findings contained in this order, that the entire website/domain itself is inseparable from the adjudicated defamation and that no narrower relief will do. The Court is mindful of the narrow-tailoring needs in this area and has exercised such restraint in the analysis. *See Saadi*, 2009 WL 3617788, at *3 (noting that "[t]he scope of the injunction must be limited to those statements"). But the Court ultimately agrees with Romspen that a take-down order pursuant to Rule 65 of the Federal Rules of Civil Procedure is fully consistent with a narrow and restrictive injunction limited only to defamatory content.

**G. *Romspen Is Entitled to an Award of General Damages*[12]**

48. Romspen is entitled to an award of general damages for Defendants' Category One Statements.

49. "General damages are conclusively presumed to result from defamation per se" and "are not required to be proved by evidence." *Lawnwood Med. Ctr., Inc. v. Sadow*, 43 So. 3d 710, 727 (Fla. Dist. Ct. App. 2010) (quotation omitted).

50. Because reputational harm and other injuries subject to general damages can be inherently difficult to quantify, "[t]here is no exact standard for fixing the compensation to be

[12] Romspen only seeks monetary damages on its claim for defamation per se [ECF No. 400 p. 38 n.6; 60 p. 31].

awarded on account of such elements of damage. Any award should be fair and just in light of the evidence." *NITV, L.L.C. v. Baker*, 61 So. 3d 1249, 1254 (Fla. Dist. Ct. App. 2011).

51. In awarding general damages for defamation per se, "the risk of uncertainty in calculating damages falls on the wrongdoer." *Sirer v. Aksoy*, 21-CV-22280, 2023 WL 3166453, at *7 (S.D. Fla. May 1, 2023); *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1379 (2d Cir. 1988) ("The Supreme Court's decisions in Bigelow and Story Parchment thus do not shift the burden of proving the cause of damages from the plaintiff to the defendant. They simply restate the established principle that where damages have been shown to be attributable to the defendant's wrongful conduct, but are uncertain in amount, the defendant bears the risk of those uncertainties.").

52. In assessing the amount of general damages, courts consider, *inter alia*: (a) that the plaintiff was publicly identified by name; (b) the breadth of the publication scope; (c) the number of defamatory statements or publications; (d) that members of the community have seen the defamatory per se statements; (e) that the defamatory per se statements remain easily accessible online; and (f) that the plaintiff "has had to expend time and effort attempting to put the allegations to rest and to clear [its] name." *Sirer*, 2023 WL 3166453, at *7; *Doe v. Predator Catchers, Inc.*, No. 22-cv-414, 2024 WL 3965754, at *8 (M.D. Fla. Aug. 28, 2024); *Lustig v. Stone*, No. 15-cv-20150, 2015 WL 13326350, at*4 (S.D. Fla. Aug. 18, 2015), *report and recommendation adopted*, 2015 WL 13326383 (S.D. Fla. Dec. 7, 2015), *aff'd*, 679 F. App'x 743 (11th Cir. 2017).

53. These factors support a substantial general damages award here. The Category One Statements accused Romspen of fraud, criminal conduct, dishonest lending practices, and other misconduct fundamentally incompatible with the proper operation of a commercial mortgage and investment business. *See* FF ¶ 35. Those accusations struck at the core of Romspen's reputation

in an industry that depends on investor trust, borrower confidence, and professional credibility. *See* FF ¶¶ 4–7. The statements were not isolated. They were published and republished across more than 175 webpages on multiple interlinked websites over approximately three and a half years. FF ¶¶ 30, 32–33, 38. They remained readily accessible online, and some were in fact viewed by Romspen's investors, who contacted Romspen with concern. *See* FF ¶ 39. Romspen was required to spend time, effort, and money responding to the accusations and attempting to mitigate the resulting reputational harm. *See* FF ¶¶ 40, 58–59.

54. Romspen is entitled to an award of $500,000 in general damages. The bases for this award include: (a) the Category One Statements are numerous, *see* FF ¶¶ 35–36; (b) the Category One Statements were published on numerous Websites with an international reach, *see* FF ¶¶ 28, 38; (c) the Category One Statements were part of a campaign that has continued for a significant period of time (3.5 years), *see* FF ¶¶ 32–33; and (d) investors in Romspen's industry actually encountered the statements and contacted Romspen with concern, *see* FF ¶ 39. To put this amount in perspective, Romspen manages assets of approximately $3,000,000,000 CAD (approximately $2.2 billion USD); the award represents less than one-tenth of one percent of assets under management.

55. This award is also reasonable in light of other defamation awards. *See, e.g.*, *Marron v. Moros*, No. 21-23190-CIV, 2023 WL 357592, at *5 (S.D. Fla. Jan. 23, 2023) (awarding $1 million in general damages where defendants published defamatory statements through internationally available media); *Sirer*, 2023 WL 3166453, at *8 (awarding $750K in general damages for defamatory statements posted on YouTube and Twitter); *Lustig*, 2015 WL 13326350, at *4 (awarding $500K in general damages for defamatory accusations posted on the internet).

**H. *Romspen Is Entitled to an Award of Punitive Damages***

56. Under Florida law, a defendant may be held liable for punitive damages "if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2).

57. "'Intentional misconduct' means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." Fla. Stat. § 768.72(2)(a).

58. "'Gross negligence' means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Fla. Stat. § 768.72(2)(b).

59. "Punitive damages are appropriate when a defendant engages in conduct which is fraudulent, malicious, deliberately violent or oppressive, or committed with such gross negligence as to indicate a wanton disregard for the rights of others." *W.R. Grace & Co.-Conn. v. Waters*, 638 So. 2d 502, 503 (Fla. 1994).

60. Punitive damages are supported by and may be awarded for defamation per se "even though the amount of actual damages is neither found nor shown, for in such a case the requirement of a showing of actual damages as a basis of an award of exemplary damages is satisfied by the presumption of injury which arises from a showing of libel or slander that is actionable per se." *Roque v. Swezy*, 429 So. 3d 107, 110 (Fla. Dist. Ct. App. 2026); *Lawnwood*, 43 So. 3d at 727–29 (affirming punitive damages award of $5,000,000 for slander per se and noting that punitive damages "may be the primary relief in a cause of action for defamation per se," including because "Florida has . . . singled out defamation per se for special rules in civil tort

litigation" as "the law presumes malice," an "intrinsic part," of the utterance of defamatory per se statements).

61. In assessing punitive damages, the Court can consider: (a) "the reprehensibility of the defendant's conduct," *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008); (b) "the nature, extent and degree of misconduct and the related circumstances," including whether the wrongful conduct was motivated by financial gain and whether the defendant had a specific intent to harm the plaintiff (Fla. Std. Civ. Jury Instr. No. 503.1); and (c) "whether the defendant's act or course of conduct has ceased," Fla. Stat. § 768.73.

62. Punitive damages are warranted here, although not to the full extent sought by Romspen. As the Court has already found, Defendants fabricated sources and fictitious authorial identities to create false credibility, published and republished the Category One Statements without personal knowledge or supporting evidence, never sought Romspen's comment or verification, continued publishing after receipt of Romspen's cease-and-desist letter and after notice of this lawsuit, escalated both the frequency and egregiousness of the accusations as the litigation progressed, and acted in part for personal financial gain. *See* FF ¶¶ 29, 31, 42–54.

63. This conduct constitutes repeated, intentional misconduct within the meaning of section 768.72(2)(a). It also reflects a high degree of reprehensibility. The misconduct was deliberate, repeated, deceitful, profit-motivated, and aimed directly at Romspen's business reputation. It did not cease after notice of falsity or after the commencement of litigation. *See* Fla. Stat. § 768.73.

64. The Court declines to award separate punitive damages against each Defendant for what the record shows was a single coordinated course of conduct carried out through alter-ego entities under Dibert's control. A single punitive award is the sounder course on this record. *See*

*Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1208 n.8 (11th Cir. 2020) (noting that multiple punitive awards for the same conduct could produce an excessive aggregate that "conceivably violate[s] due process").

65. Romspen is entitled to an award of $1,000,000 in punitive damages.[13] The Court's general damages award is $500,000, yielding a punitive-to-compensatory ratio of 2:1—well within the single-digit range that generally comports with due process. *See Pinnacle Fin. Grp., Inc. v. TriStar Acceptance, LLC*, No. 16-62169-CIV, 2017 WL 7355331, at *2 (S.D. Fla. July 17, 2017), *report and recommendation adopted*, 2017 WL 7362290 (S.D. Fla. Aug. 9, 2017) ("Florida courts have held that single-digit multipliers are likely to comport with due process while still achieving the State's goals of deterrence and retribution."); *Kerrivan*, 953 F.3d at 1210 (upholding 1.6:1 ratio). For the reasons stated in CL ¶¶ 62–63, the degree of reprehensibility is high; Defendants' conduct was deliberate, repeated, deceitful, profit-motivated, and did not cease after notice of falsity or commencement of litigation. Defendants have claimed to be judgment-proof and to have no assets, *see* FF ¶ 26; the Court notes that the absence of disclosed assets does not preclude a punitive award grounded in reprehensibility and deterrence. The award is not disproportionate to comparable civil penalties; Florida's Deceptive and Unfair Trade Practices Act authorizes penalties of up to $10,000 per willful violation, Fla. Stat. § 501.2075, and given the number and sustained nature of Defendants' individual defamatory publications, aggregate statutory penalties could approach or exceed the punitive award entered here. This amount is substantial enough to

[13] This award is lower than Romspen's request of $4,000,000 in punitive damages, calculated at $1,000,000 per each of the four Defendants [ECF No. 400-1 p. 21]. The Court, as stated above, elects to impose a single punitive award to reflect the interconnected nature of Defendants' misconduct on the record presented. FF ¶¶ 18–20, 24. The Court also determines that the punitive-to-general-damages ratio produced by an award of $1,000,000 in punitive damages (2:1) is more consistent with due process principles than the 8:1 ratio sought by Plaintiff.

punish and deter Defendants' sustained defamation campaign yet remains measured in relation to the evidentiary record and comparable defamation awards in this circuit. *See Zedan v. Bailey*, 522 F. Supp. 3d 1363, 1379–80 (M.D. Ga. 2021) ("Given all of these factors, the Court finds that a punitive damages ratio of 1:1 with the general and special damages is appropriate."); *cf. Williams v. First Advantage LNS Screening Sols. Inc.*, 947 F.3d 735, 763 (11th Cir. 2020) (noting that a 13:1 ratio violated due process).

## CONCLUSION

In conclusion, the Court finds that Dibert, acting through the LLC Defendants, intentionally authored, published, and republished false and defamatory statements regarding Romspen on the publicly available websites identified in this Court Order at Findings of Fact ¶¶ 32–34, warranting an award of damages in favor of Romspen as specified herein.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Romspen has satisfied its burden of proof on Counts I and II of the Second Amended Complaint [ECF No. 60].
2. Judgment is entered in favor of Romspen and against all Defendants, jointly and severally, on Count II (Defamation Per Se) in the amount of $500,000.00 in general damages and $1,000,000.00 in punitive damages, for a total monetary judgment of $1,500,000.00 plus post-judgment interest (exclusive of the additional monetary sanctions imposed in this proceeding and memorialized in a forthcoming final judgment).[14]
3. Defendants shall, within fourteen (14) days of the date of this Order, remove from the internet all Postings identified in Findings of Fact ¶¶ 32–34.

[14] Romspen withdrew any request for general or punitive damages on Count I but still established all of the essential elements of that claim, including injury [ECF No. 400 p. 38 n.6]. FF ¶¶ 40, 58 –60.

4. Defendants, their officers, agents, servants, employees, and attorneys, and any other persons in active concert or participation with such parties, officers, agents, servants, employees, and attorneys are permanently enjoined from publishing, republishing, repeating, or otherwise disseminating—whether on the Websites identified above or on any other platform, website, account, or medium—the specific Category One Statements and Category Two Statements adjudicated in this Order as delineated in Findings of Fact ¶¶ 32–34 and any other statements materially indistinguishable from those adjudicated statements.
5. Defendants, their officers, agents, servants, employees, and attorneys, and any other persons in active concert or participation with such parties, officers, agents, servants, employees, and attorneys shall also, for the reasons stated in this Order, take down the website www.RomspenRipoff.com, whose sole purpose is to defame Romspen by serving as a dedicated vehicle for the publication, republication, and amplification of the false and defamatory statements adjudicated in this Order.
6. Final Judgment to follow by separate order.

**ORDERED** in Chambers at Fort Pierce, Florida, this 28th day of August 2026.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record